82 N.J. 362 (1980)
413 A.2d 335
STATE OF NEW JERSEY IN THE INTEREST OF B.C.L.
The Supreme Court of New Jersey.
Argued November 27, 1979.
Decided March 27, 1980.
*368 Patrick T. McGahn, Jr. argued the cause for appellant B.C.L. (McGahn and Friss, attorneys; Solomon Friss on the brief).
Solomon Forman, First Assistant Prosecutor, argued the cause for the respondent State of New Jersey (Richard J. Williams, Atlantic County Prosecutor, attorney).
Anne C. Paskow, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (John J. Degnan, Attorney General of New Jersey, attorney).
The opinion of the Court was delivered by PASHMAN, J.
This case presents our first opportunity to consider public disclosure of information regarding an adjudicated juvenile offender. In 1977, the Legislature enacted N.J.S.A. 2A:4-65(c), L. 1977, c. 255, which entrusted juvenile courts with authority to release the names, offenses and dispositions of youths 14 years of age or older who are adjudged delinquent for having committed certain serious offenses. The statutory standards for withholding such information are "good cause" and the furtherance of "the best interests of the juvenile and the public." Id. In reviewing the decision of a juvenile court permitting disclosure, we are here called upon to interpret the new legislation, examine specific criteria for justifying confidentiality, and provide appropriate procedural guidelines for the release of such information.

I
In October 1977 B.C.L., then 16 years old, and three other juveniles attempted to extort $10,000 from the owner of an *369 Atlantic City motel. After one of B.C.L.'s companions set a fire in a trash chute at the motel, the juveniles sent the owner a written demand for money. In the note they threatened to burn down the building if they did not receive the $10,000. The motel owner contacted the police, who placed a tap on the owner's telephone while he was awaiting instructions for payment. The next day the police traced to B.C.L.'s home three telephone calls directing where to leave the money. A briefcase stuffed with papers was dropped at the designated spot, but surveillance of the area proved fruitless.
The following day, the motel owner received new telephone instructions giving him "another chance" to make payment. A second package containing both real and bogus money was left at a different location. The police apprehended a juvenile who attempted to pick up the package. Further police investigation led to the arrests of B.C.L. and two other juveniles.
After the other juveniles were adjudicated delinquent, each of them moved under N.J.S.A. 2A:4-65(c) to have their identities kept confidential. The motions were denied, and the Atlantic County Prosecutor's Office released their names to local news media.
On January 12, 1978, following a plea of guilty, B.C.L. was found delinquent on charges of attempted extortion, arson and conspiracy. On February 16 the court ordered him committed to the Youth Reception and Correction Facility at Yardville for an indeterminate term. The court suspended this sentence and placed B.C.L. on probation until his 18th birthday.
At the time of disposition, counsel for B.C.L. moved under N.J.S.A. 2A:4-65(c) to have information concerning him withheld from the public. At a hearing on March 23, 1978, counsel presented the testimony of three experts on the psychological problems of juveniles. Jeffrey Roberts, the Director of the Atlantic County Youth Services Bureau, testified that he had been counseling B.C.L. weekly since December 1977. At that *370 time, according to Roberts, the juvenile was suffering from feelings of insecurity and inferiority and had a limited capacity to handle peer relationships. Roberts testified that with counseling B.C.L. had made progress in overcoming his problems. In the expert's opinion, however, public release of the youth's name would severely inhibit his emotional growth and maturation.
Joel R. Miller, a clinical psychologist, described B.C.L. as an adolescent with many problems. He characterized the juvenile as a very shy person exhibiting a low self-esteem, tension, depression and obsessive-compulsive symptoms. Miller believed the juvenile was upset because he was short and lacked the mental resources to combat any stigma or bear its pain. The witness stated that B.C.L. was currently making progress in school and with his social relationships, but that any unfavorable attention resulting from the publication of his name would traumatically reverse this development.
Finally, Dr. Frederick Erskine, a psychiatrist, testified that he did not find B.C.L. to be "criminal-minded" in any way. Impressed by the juvenile's frankness and honesty, Dr. Erskine felt that B.C.L. demonstrated appropriate remorse and contrition. He described the youth as emotionally immature, having feelings of inferiority and inadequacy. Dr. Erskine agreed with the other witnesses that the release of the juvenile's identity and the circumstances of his offenses would be detrimental to his rehabilitation.
Although the State presented no rebuttal testimony, the court denied the juvenile's application. It found that B.C.L. had not demonstrated "good cause" for withholding dissemination under the statute. N.J.S.A. 2A:4-65(c). The court was not persuaded by the anticipated impact of publication on B.C.L.'s rehabilitation, even though the juvenile's name would receive particular attention because of his father's local political prominence. The court concluded that the public's interest in the disposition of serious juvenile offenders outweighed the juvenile's interest in *371 confidentiality. B.C.L.'s counsel sought and received an order staying publication pending appeal.
Concluding that the juvenile court had properly considered the interests of both the public and the juvenile, the Appellate Division affirmed. In striking a balance of policies in favor of disclosure, the court emphasized that the "best interest of the public" within the meaning of N.J.S.A. 2A:4-65(c) "comprehends not only the public's right to know the facts but also the salutary effect of publicity in deterrence of the affected juvenile and others." The court also held that in determining whether to release a juvenile's identity, the prominence or status of his family should not be relevant. The Appellate Division continued the stay on release of the information pending application to this Court.
We granted the juvenile's petition for certification. 81 N.J. 273 (1979). We now affirm.

II
This State has historically followed a policy of maintaining the confidentiality of juvenile court proceedings and records. See generally, State v. Allen, 70 N.J. 474, 479-481 (1976). This policy was first expressed statutorily in 1929 by the Juvenile and Domestic Relations Court Law, L.1929, c. 157. Section 27 of that act provided in relevant part:
The Court shall maintain complete records of all petitions and hearings in cases brought before it. Such records shall be withheld from indiscriminate public inspection but shall be open to inspection by the parent or other authorized representative of the person concerned and, in the discretion of the court, by other persons having a legitimate interest.
Although section 27 was deleted in a 1951 statutory revision, L.1951, c. 344, in 1948 this Court had incorporated the policy on confidentiality into Rule 6:2-7(b) (1948). The rule governed procedure in Juvenile and Domestic Relations Courts and read in part:

*372 (b) Social records shall consist of reports of social investigations, probation treatment or supervision, psychological or psychiatric examinations, and other reports concerning family life or compositions, school or occupational history, physical condition, foster home placement, and delinquent behavior of children. Such records shall be strictly safeguarded from indiscriminate public inspection. [emphasis supplied]
The latest expression of the policy came in 1973, when N.J.S.A. 2A:4-65(a) was enacted. It provided that juvenile records could be disclosed only to certain specified parties:
(1) Any court or probation department;
(2) The Attorney General or county prosecutor;
(3) The parents or guardian and to the attorney of the juvenile;
(4) The Division of Youth and Family Services, if providing care or custody of the juvenile;
(5) Any institution to which the juvenile is currently committed; and
(6) Any person or agency interested in a case or in the work of the agency keeping the records, by order of the court for good cause shown. [L. 1973, c. 306, § 24]
In State v. Allen, supra, we held that "good cause" existed under N.J.S.A. 2A:4-65(a)(6) to allow the prosecutor to examine the juvenile records of a defendant's crucial alibi witness. The prosecutor was also permitted to use them, if necessary, as the basis to apply for a psychiatric examination of the witness. The analysis which the Court adopted in Allen reflects an attempt to reconcile the conflicting interests of the juvenile and the public. Justice Schreiber articulated the Court's views:
Both the Legislature and the Supreme Court have through the years evinced in their respective statutes and rules a policy of preventing the use of evidence adduced in a juvenile's proceeding in any other court and of limiting the availability to others of a juvenile's records, including psychological or psychiatric examinations. However, the statutes and rules have always recognized that the juvenile's records should be available to third persons with a sufficient *373 legitimate interest or whenever proper administration of justice so required. These competing policies must be weighed in the light of all the pertinent circumstances and, if possible, balanced to safeguard the purposes of both. [70 N.J. at 482-483 (footnote omitted)]
Prior to our decision in Allen, Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), presented the United States Supreme Court with a conflict between the state policy of confidentiality of juvenile records and defendant's Sixth Amendment right to confront adverse witnesses. The Supreme Court held that the policy of confidentiality must yield so that a prosecution witness's juvenile record could be used to impeach him. See also State v. Hare, 139 N.J. Super. 150 (App.Div. 1976), certif. den., 70 N.J. 525 (1976); State v. Parnes, 134 N.J. Super. 61 (App.Div. 1975); State v. Brown, 132 N.J. Super. 584 (Law Div. 1975); State in the Interest of A.S., 130 N.J. Super. 388 (J. & D.R.Ct. 1974).
Recent Supreme Court cases concerning freedom of the press have also eroded this State's long-standing policy of shielding juvenile offenders from public scrutiny. In Oklahoma Publishing Co. v. District Court, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977), the Supreme Court held invalid a state court injunction which prohibited publication of the name or picture of a juvenile defendant since truthful information regarding the juvenile had been lawfully obtained and already publicly revealed. More recently, Smith v. Daily Mail Publishing Co., 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979), held that a newspaper could not be prosecuted for disclosing the identity of a juvenile offender without court approval when the newspaper had acquired the information by lawful means. Cf. N.J.S.A. 2A:4-65(d). The Smith Court noted that as in Davis v. Alaska, the sole state interest was in protecting the anonymity of the juvenile offender. The Court maintained that
[t]he important rights created by the First Amendment must be considered along with the rights of defendants guaranteed by the Sixth Amendment. * * * *374 Therefore, the reasoning of Davis that the constitutional right must prevail over the State's interest in protecting juveniles applies with equal force here. [443 U.S. at 104, 99 S.Ct. at 2671, 61 L.Ed.2d at 406 (citations omitted)]
While the confidentiality of juvenile records was receiving this closer judicial scrutiny, in 1977 the Legislature amended N.J.S.A. 2A:4-65, thereby substantially altering State policy. N.J.S.A. 2A:4-65(c), L. 1977, c. 255. The amendment provides:
c. Information as to the identity of a juvenile 14 years of age or older adjudicated delinquent, the offense, the adjudication and the disposition may be disclosed to the public where the offense for which the juvenile has been adjudicated delinquent involved violence to the person or, if committed by an adult, would constitute a high misdemeanor,[1] murder, manslaughter, destruction or damage to property to an extent of $500.00 or more, or the manufacture or distribution of a narcotic drug, unless upon application at the time of disposition and for good cause shown, or upon its own motion, the court orders the withholding from public dissemination of all or a portion of such information on the grounds that public disclosure would not serve the best interests of the juvenile and the public.
The amendment to N.J.S.A. 2A:4-65 essentially adopted the proposal of the Supreme Court's Juvenile Justice Task Force, "Confidentiality of Juvenile Court Proceedings," 100 N.J.L.J. 65 (1977) (hereinafter Task Force Report). The Task Force concluded[2] that wider disclosure of juvenile proceedings was necessary because

*375 there are certain instances in which the right of the public to be informed as to the final outcome of a delinquency proceeding should receive preference over the maintenance of confidentiality. This may be so either due to the seriousness of the offense itself, or because the prior behavior of the juvenile has led to a conclusion that rehabilitation is less probable. [100 N.J.L.J. at 74]
The Task Force Report proposed that disclosure of the names of juveniles involved in serious offenses be mandatory in the absence of an objection. Id. However, the Legislature tempered the Task Force's recommendation and provided for discretionary disclosure in N.J.S.A. 2A:4-65(c).
Against the background formed by these changes in "[t]he general policy of confidentiality and limited disclosure," Allen, 70 N.J. at 479, we must decide whether the juvenile court erred in ordering the release of B.C.L.'s name. As the Appellate Division noted, while N.J.S.A. 2A:4-65(c) is less than a paradigm of clarity, the statute provides as the general rule that there should be disclosure. This general rule does not apply when "upon application at the time of disposition and for good cause shown, or upon its own motion, the court [finds that] * * * public disclosure would not serve the best interests of the juvenile and the public." N.J.S.A. 2A:4-65(c).
To articulate this exception, we note that its history reveals two paramount considerations: the juvenile's prospects for rehabilitation and the public's right to be informed. See Task Force Report, supra, 100 N.J.L.J. at 65. Moreover, we agree with the Appellate Division that the "best interest of the public" embraces "not only the public's right to know the facts but also the possible salutary effect of publicity in deterrence of the affected juvenile and others." Thus the determination by the juvenile judge regarding disclosure should involve a weighing of the public's right to know and the deterrent effect of disclosure against the particular juvenile's prospects for rehabilitation.[3] This balancing should also take account of the specific *376 circumstances of the juvenile's offense. Since the statute requires "good cause shown" for confidentiality, the burden is on the delinquent to demonstrate that "the best interests of the juvenile and of the public" would not be served by disclosure.
The dissent's objections to this shift away from complete confidentiality, see post at 387-388, seem properly directed at the Legislature. By enacting a limited disclosure statute, the Legislature has determined that in many cases, the assistance which absolute secrecy might provide to rehabilitation may not be secured at the expense of the public's right to know. This is neither a total repudiation nor a complete subordination of the goal of rehabilitation. Cf. post at 384, 385. It is, however, a substantial change in public policy. To assail that policy would be "to skirt the legislative domain and to deal with issues most properly the concern of the Legislature." New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Commission, 82 N.J. 57, 81 (1980). We decline in this matter to question the judgment of the Legislature, much less criticize it.

III
In the present case, the juvenile's chief argument against disclosure is that the State offered no evidence to refute the testimony of his three expert witnesses. He therefore asserts that the juvenile court's decision is not supported by the record.
While the absence of evidence minimizing the prospects for rehabilitation calls for close scrutiny, the juvenile court was not obligated to accept the opinions of the juvenile's witnesses simply because the State offered no contrary testimony. *377 Even accepting these opinions as accurate assessments, we are nevertheless convinced that the court's determination was correct. Although the release of the juvenile's name might affect his rehabilitation in some generally adverse manner, this alone does not constitute "good cause" under N.J.S.A. 2A:4-65(c). We fully agree with the juvenile court that the testimony offered by B.C.L.'s witnesses in favor of withholding disclosure could apply with equal force to the overwhelming majority of juvenile offenders. Since the Legislature intended disclosure to be the rule and not the exception, the juvenile must demonstrate a substantial likelihood of specific harm to constitute a showing of "good cause." He has not done so here.
The decision to release information presents a clash of policies similar to that found in the determination to invoke criminal jurisdiction over a juvenile offender. This Court has held that rehabilitation is not the sole criterion in deciding whether to prosecute a juvenile as an adult defendant.[4] Courts *378 should also consider the welfare of society  the security created by deterring future crimes. State v. Van Buren, 29 N.J. 548, 557 (1959). The seriousness of the offense is therefore relevant when the Juvenile Court determines whether it should waive jurisdiction. See State v. Lueder, 74 N.J. 62, 77 (1977). Indeed, even when a juvenile has no prior record, the seriousness of the offense alone can suffice to justify waiver. State in the Interest of B.T., 145 N.J. Super. 268, 277 (App.Div. 1976), certif. den. 73 N.J. 49 (1977).
The gravity of the offense can also be sufficient warrant for disclosure under N.J.S.A. 2A:4-65(c). Implicit in the public's recognized right to be informed is its ability to have the information necessary for its security. Since protection of the public is an obvious goal of the juvenile justice system, the public has a right to know that the system is protecting our society adequately. See Task Force Report, supra, 100 N.J.L.J. at 65. The concerns reflected in the new statute attach considerable importance to the serious character of B.C.L.'s acts of arson, conspiracy and extortion. In appropriate cases, the nature of the offenses alone may constitute sufficient reason for disclosure.
The fact that B.C.L. is a member of a locally prominent family, which makes his juvenile adjudication particularly newsworthy, is a factor which the Juvenile Court rightly did not consider. If the prominence of a juvenile's family were an appropriate consideration  because the added publicity might hinder rehabilitation  it could effectively exempt such juveniles from the disclosure statute. To withhold the identity of B.C.L., particularly when the names of the three conspiring juveniles were released, could adversely affect the public's perception of the juvenile justice system. This does not mean that a court must disclose one juvenile's identity because it has ordered *379 disclosure as to his co-defendants. Nevertheless, the Juvenile Court must always consider the effect of non-disclosure on the appearance of even-handed juvenile justice.[5]
In holding that the Juvenile Court was correct in ordering disclosure, we have reviewed the relevant factors as they existed at the time the matter was before that court. The exercise of a Juvenile Court's discretion under N.J.S.A. 2A:4-65(c) should be treated similarly to a sentencing judge's exercise of discretion. In State v. Leggreadrini, 75 N.J. 150, 162 (1977), we stated that
[a]ppellate deference to the discretionary decision of a sentencing judge is similar, in purpose and origin, to that accorded decisions of a trier of fact. It is based primarily on the sentencing judge's presumed superior ability to make a firsthand evaluation of the background and character of the defendant and the offense. * * * [O]ur evaluation of the record enables us to determine whether the sentencing judge's discretion has been abused by the imposition of a manifestly excessive sentence * * * [Emphasis supplied]
The aim of appellate review of factual findings is to "determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record." State v. Johnson, 42 N.J. 146, 162 (1964). (emphasis supplied). To determine, therefore, whether the juvenile court was mistaken in its exercise of discretion concerning disclosure, the appropriate inquiry is directed to the facts which existed at the time of the judge's determination as disclosed in the record on appeal.
*380 In examining the record, we do not make an independent assessment of the facts. To do so would infringe on the discretion vested in the trial court by the Legislature. It would also foster delay in reaching a final decision on disclosure at the expense of the public's right to know. As with other findings of fact by a trial judge, our task is to determine whether "they are so wholly insupportable as to result in a denial of justice." Rova Farms Resort, Inc. v. Investor Ins. Co. of America, 65 N.J. 474, 483-484 (1974) (quoting Greenfield v. Dusseault, 60 N.J. Super. 436, 444 (App.Div. 1960), aff'd o.b., 33 N.J. 78 (1960)); see also State v. Whitaker, 79 N.J. 503, 514-515 (1979). Reviewing the juvenile judge's discretion in light of subsequent events would inevitably and unfairly favor those with the resources to tie up the matter in the courts for years, thus literally buying time to develop a record demonstrating the juvenile's successful rehabilitation. Any changed circumstances occurring after the Juvenile Court's determination must therefore be irrelevant to our review of that court's exercise of discretion.
Contrary to the intimations of the dissent, confidentiality should not be offered as some kind of reward for a successful rehabilitation. See post at 388-390. Such an approach exhibits little respect for the public's right to know, which becomes an empty formality with the passage of time. This approach is also inconsistent with the dissent's view, which we share, that "subsequent events * * * properly ought not to influence our decision * * *." Post at 384 n. 1. The decision to disclose cannot fulfill its purpose if not timely made.

IV
Since N.J.S.A. 2A:4-65(c) is lacking in procedural detail, we take this opportunity to establish guidelines for effecting the disclosure permitted under this statute.
To insure that the juvenile offender is aware of the possibility of disclosure under the new provisions, the predispositional *381 report should give notice that his identity may be publicly disclosed unless he successfully objects at the time of his disposition. We therefore direct that the following language, suggested by the Attorney General as amicus curiae, be included in each predispositional report:
Information concerning your identity, offense, adjudication and disposition is subject to public disclosure unless at the time of disposition you interpose an appropriate objection with the court in accordance with N.J.S.A. 2A:4-65(c).
When a juvenile raises timely objection to disclosure, the statute contemplates that he should have some opportunity to demonstrate "good cause." In the present case the Juvenile Court held a hearing to determine whether the juvenile's name should be disclosed. Although the disclosure decision will significantly affect the juvenile's welfare, a full hearing with oral testimony will not always be necessary. If the court believes that a determination can be fairly made solely on the basis of the moving papers and case record, a hearing is not required. If the court decides to hold a hearing, it should be a summary proceeding limited in scope to the nature of the questions involved. The court has discretion to hear oral testimony, to restrict the hearing to legal argument or to deny one altogether.[6] Regardless of whether a hearing is held, however, the Juvenile Court must state its reasons for disclosure or nondisclosure *382 on the record. Cf. R. 3:21-4(e); R. 5:6-1(a) (requiring a judge to state his reasons for imposing a sentence on the record).
Absent a showing of "good cause" by the juvenile or a decision on the court's own motion to withhold his identity, R. 5:9-1(a) provides that "[a] judge may authorize or may himself disclose information in accordance with the Juvenile and Domestic Relations Court Law (Title 2A, Chapter 4)." If read in conjunction with N.J.S.A. 2A:4-65(c), this rule clearly indicates that the court is not the sole entity permitted to disseminate this type of information. When authorized by the court, the prosecutor may therefore release the relevant information. However, only the prosecutor and the Juvenile Court itself may make disclosure under N.J.S.A. 2A:4-65(c).

V
For the foregoing reasons, we hold that the Juvenile Court judge did not mistakenly exercise his discretion when he refused to withhold B.C.L.'s identity and the circumstances of his offense. Accordingly, the stay on disclosure is dissolved and the judgment of the Appellate Division affirmed.
HANDLER, J., dissenting.
The Court in this case has determined that B.C.L., a first-time juvenile offender, is not entitled under L.1977, c. 255, N.J.S.A. 2A:4-65(c), to have his name remain confidential. This, despite a convincing showing that his excellent prospects for complete rehabilitation would be seriously jeopardized by such disclosure. The result reflects a reading of the statute which will dictate such disclosure in virtually all cases involving a serious offense without any regard to whether or not the juvenile is salvageable as a productive human being. The ruling is harsh, unfair and clearly at war with the intendment of the statute. I therefore dissent.
When B.C.L. was 16 years old and a high school junior, he and three juvenile companions committed a most serious offense. *383 They started a fire in the trash chute of a motel and attempted to extort money from the motel owner by threatening over the telephone to burn the building to the ground. Their bizarre adventure in delinquency was brought to a quick end. Speedy and efficient police work resulted in the prompt arrest of all the juveniles, who were appropriately charged and adjudicated delinquent.
B.C.L. did not contest the charge of delinquency. His guilty plea was accepted by the court on January 12, 1978, a few months after the commission of the offense. One month later, on February 16, the court conducted a dispositional hearing at which B.C.L. was committed to the Youth Reception and Correction Center at Yardville for an indeterminate term. This sentence was suspended and B.C.L. was placed on probation until his eighteenth birthday. At that hearing, the juvenile, through counsel, specifically sought to have his name withheld from the public pursuant to N.J.S.A. 2A:4-65(c) and a hearing was subsequently conducted on March 23, 1978 for a determination of whether disclosure would be in the public interest.
At the hearing on this motion, some five weeks after the initial dispositional proceeding, B.C.L. produced three expert witnesses who testified that release of the information would harm B.C.L. and, further, would jeopardize the progress toward rehabilitation that he had already begun to make. One expert, the director of the Atlantic County Youth Services Bureau, was firmly of the opinion that releasing B.C.L.'s name would have an "extremely detrimental" effect on the youth, both immediately and in terms of growth and maturation on a "long term life basis." A second expert, a clinical psychologist, commented upon B.C.L.'s "very, very limited resources to rationilize [sic] away the pain of stigma," and stated that disclosure of his name would be detrimental to B.C.L.'s best interests since it would result in "a rather traumatic set back [sic]" and would also create enormous additional problems for him. A third expert witness, a psychiatrist, was of the opinion that release of B.C. *384 L.'s name would result in "additional [self]-depreciation and humiliation and abuse."
The majority opinion creates the impression that the trial judge carefully evaluated this evidence, reached reasoned findings of fact, appropriately balanced the competing concerns of the statute, and arrived at a well-founded conclusion that, under all of the circumstances, the statute reasonably calls for the disclosure of this juvenile's name. Ante at 370. That simply is not so. The trial judge did note that this was B.C.L.'s first offense and that the predisposition report suggested strong prospects for rehabilitation. Nevertheless, he failed to evaluate the juvenile's chances for successful rehabilitation, and, more significantly, he failed to give any weight whatsoever to the clear, uncontroverted and convincing testimony that disclosure here would have a direct and demonstrable adverse impact upon the juvenile's rehabilitation.
The majority's opinion places a gloss of reasonableness on the lower court's determination. The majority; for example, appears unmoved by the juvenile's strong prospects for rehabilitation despite convincing evidence to that effect.[1]Ante at 369-370. The Court also finds that threatened disclosure of the juvenile's name would not impair his efforts at rehabilitation. Ante at 377. Again, the evidence is pointedly opposite. The Court then determines in conclusory fashion that disclosure of the juvenile's name is required to satisfy the public's interest in full information and deterrence of others. Ante at 377-378.
The majority has failed to account for the evidence adduced below of both the strong rehabilitative prospects of this juvenile and the fact that disclosure would impair or jeopardize these *385 prospects. The affirmative evidence as to both these propositions was cogent and convincing. In disregarding this evidence and in effectively assuming that the gravity of the offense alone requires disclosure of the offender's name, the majority has fashioned what will be regarded as a self-executing, per se rule that completely subordinates, if not eliminates altogether, rehabilitation as a statutory goal. This was not, in my view, what the Legislature intended.
The statute, N.J.S.A. 2A:4-65(c), essentially tracks a proposal in the majority report of the Juvenile Justice Task Force which was submitted to the Chief Justice in January 1977. Juvenile Justice Task Force, Confidentiality of Juvenile Court Proceedings, 100 N.J.L.J. 65 (1977) (hereinafter cited as N.J. Task Force Report). This report was the result of several years of intensive study and debate on the subject of confidentiality in juvenile proceedings. The majority concluded in its report that disclosure of a juvenile's name would be appropriate either "due to the seriousness of the offense itself, or because the prior behavior of the juvenile has led to a conclusion that rehabilitation is [not] probable." Id. at 74. Nevertheless, the majority's proposal provided for continued confidentiality, despite the seriousness of the offense, where this would best serve the interest of both the public and the juvenile. Ibid.
A member of the Task Force filed a vigorous dissent to the majority report's requirement of mandatory disclosure, pointing out that in 1964 then Governor Hughes had vetoed a bill that would have released the names of juveniles who committed high misdemeanors. His message, returned with the vetoed bill, found the existing limited release of juvenile information sufficient to protect the public without endangering the broad social need served by confidentiality as a tool to foster rehabilitation. Id. at 75-76. The dissent also noted that existing legislation provided for disclosure when a juvenile sixteen years old or over was treated as an adult offender. The dissent concluded by urging consideration of less drastic alternatives than publication. Id. at 76. Following review of the dissent and of various *386 comments submitted, the Task Force proffered an addendum, in which it stated that
[t]he juvenile's age and prior record would, of course, be among the factors for consideration by the Juvenile Court in exercising its discretion not to permit disclosure where it would otherwise be authorized. [Id. at 77.]
Although several proposals to effect disclosure were brought before the Legislature, those versions calling for mandatory disclosure were rejected. The legislative enactment of L. 1977, c. 255, by employing the word "may" rather than "shall," clearly made disclosure discretionary. Cf. State in the Interest of D.H., 153 N.J. Super. 490, 493-495 (App.Div. 1977) (since N.J.S.A. 2A:4-65(b) permitted, although it did not compel, disclosure of a juvenile's identity to the victim or the victim's immediate family to enable them to seek civil relief, disclosure to the victim's insuror, as its subrogee, was properly within the court's discretion).
It is of some significance that all fifty states seek to some extent to protect the identity of juveniles. In the juvenile statutes of New Jersey and six other states, however, the names of an adjudicated juvenile who either has a prior record or has committed a serious crime, or both, may or must be disclosed.[2] *387 The New Jersey statute attempted to accommodate and reconcile the long-accepted need for confidentiality of juvenile court proceedings with the growing acknowledgement of the dual needs for deterrence and public knowledge. What is lost in the majority's application of the New Jersey statute, however, is recognition of the continued importance of rehabilitation in juvenile proceedings and of confidentiality as an integral component of that rehabilitation. While the statute has reduced the significance of rehabilitation, it no longer being the predominant concern of such proceedings, the Legislature has by no means totally repudiated rehabilitation as a vital objective of the juvenile justice system. Rather, it has by this legislation brought rehabilitation into parity or equipoise with other societal concerns of deterrence and public knowledge.
It follows that in all juvenile proceedings the possibility of rehabilitation must still be accorded scrupulous attention and the role of confidentiality or nondisclosure in contributing to any such rehabilitation remains an important consideration in the disposition of juvenile cases. The critical function of confidentiality in the rehabilitative process has long been accepted. The negative ramifications of stigmatizing a child as a delinquent were recognized by the Supreme Court in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), and have been discussed by many commentators, see, e.g., N. Kittrie, The Right to Be Different 102-168 (1971). It has also been suggested that publication of information consisting of a child's name and misconduct panders to a youngster's taste for notoriety which society ought not encourage. Geis, "Publication of the Names of Juvenile Felons," 23 Mont.L.Rev. 141, 164 (1961). It has been frequently asserted that negative social labels stimulate antisocial behavior; they create the expectation that an individual will conform to the label and "play an important part in an individual's passage from merely having committed a *388 questionable act to possessing a `deviant character.'" Payne, "Negative Labels: Passageways and Prisons," 19 Crime and Delinquency 33, 35 (1973); see also Faust, "Delinquency Labeling: Its Consequences and Implications," 19 Crime and Delinquency 41 (1973). "The stigma of the court record becomes a handicap to the juvenile in terms of isolation from his peers, greater surveillance by police officers, lowered tolerance by school personnel, and rejection by prospective employers." P. Piersma et al., Law and Tactics in Juvenile Cases 12 (3d ed. 1977). See generally Note, "Juvenile Delinquents: The Police, State Courts, and Individualized Justice," 79 Harv.L.Rev. 775, 799-801 (1966).
These insights have been shared by our courts. This Court has opposed the needless denigration of juveniles. In State in the Interest of M.S., 73 N.J. 238 (1977), a JINS ("juvenile in need of supervision") left a supervised shelter without permission and was charged with delinquency for so doing. Holding that the solution was not to be found in increased punishment, which would require an adjudication of delinquency, but rather in better supervision at such shelters, we reasoned that to adjudicate the youngster "a juvenile delinquent" would permanently label him with a term only slightly less stigmatizing than "criminal" would be for an adult. 73 N.J. at 245. Accord, In re Gault, supra, 387 U.S. at 23-24, 87 S.Ct. at 1441-1442, 18 L.Ed.2d at 544. Thus, even though rehabilitation may no longer be the preeminent goal of a juvenile disposition, it nevertheless endures as a significant consideration guiding the discretion of the courts, as does confidentiality as a factor in such rehabilitation.
The Appellate Division in this case concluded that the phrase "the `best interest of the public' within the intent of the statute comprehends not only the public's right to know the facts but also the possible salutary effect of publicity in deterrence of the affected juvenile and others." One may readily agree with this general observation. The statute, however, must also be read as *389 focusing upon the singular interest that the public and the juvenile have in common, viz, both the child and the public have a vital and positive interest in the child's rehabilitation. N.J. Task Force Report, supra, 100 N.J.L.J. at 74. When the child's prospects of rehabilitation are sufficiently great that the public will be better served by encouraging the child's self-improvement and reintegration into society, helping the child to deal with his problems in privacy and maintaining confidentiality further the public's interest as well as the child's. Thus, the statute requires a court to gauge the extent to which the public's interest and that of the child coincide and the extent to which they are in conflict.
The statutory phrase "for good cause shown" is designed to trigger this very process. It is not without significance that the trial judge here noted that the predisposition report indicated that the juvenile could be rehabilitated. The judge, in fact, imposed a probationary term, a sentence obviously designed to further B.C.L.'s rehabilitation. There was apparent appreciation on the judge's part that the public's interest, including the need for deterrence, would not be disserved by such a probationary disposition. If there were any doubt whatsoever as to whether the confidentiality of B.C.L.'s name would be conducive toward his rehabilitation (a doubt which, I submit, should have been completely dispelled by the evidence presented at the hearing), the continued confidentiality of the juvenile's name could have been made a conditional term of B.C.L.'s probation. In that way the court would have made clear to B.C.L. that as long as he continued to progress toward rehabilitation, his name would not be revealed; if, however, he regressed or failed to make sufficient gains or offended again, the court could then decide to disclose his name to the public.[3] Such a disposition, by *390 giving the juvenile himself the means for avoiding his own notoriety, would have afforded the juvenile added incentive to shed the vestiges of delinquency and to become a responsible citizen. Unfortunately, this disposition did not occur to the trial judge.
The majority professes concern that the nondisclosure of B.C.L.'s name will create the public impression that the juvenile system works unfairly, favoring certain juveniles over others. Ante at 378-379. This is utter speculation, fed perhaps by the Court's undeveloped and unexplored reference that the names of B.C.L.'s juvenile cohorts in this escapade were apparently released. Ibid. The circumstances surrounding the propriety of the disclosure of the names of the other juveniles, however, were not revealed in these proceedings. We thus have no way of knowing, even on a comparative basis, whether the disclosure of their names was appropriate; whereas the record as actually presented to us, in my opinion, clearly establishes that the disclosure of B.C.L.'s name was wrong.
This Court has often iterated the need to consider scrupulously the circumstances of each individual who is before the court to be sentenced. E.g., State v. Leggeadrini, 75 N.J. 150, 159-161 (1977); cf. N.J.S.A. 2C:1-2(b)(4), (6). This individualized scrutiny is extremely important as to all youthful offenders, e.g., State v. McBride, 66 N.J. 577, 580 (1975); State v. Spinks, 66 N.J. 568, 575-576 (1975), but it is critical with respect to a juvenile, In re Lewis, 11 N.J. 217, 224 (1953). It is difficult to believe that the individualized disposition of a juvenile proceeding resulting in an order preserving the confidentiality of the juvenile's name could impugn the reputation of the juvenile justice system for fairness and evenhandedness.
*391 The Court quite properly points out that, to the extent that the public has an interest in being generally informed as to juvenile proceedings, this interest gains no strength here from the fact that the juvenile's father is a prominent person in the community, a factor which unfortunately lends additional newsworthiness to the youngster's difficulties. Ante at 378-379. Such a motive for the disclosure of a juvenile's name would be highly improper. I endorse the Court's rejection of such a consideration obtruding into juvenile dispositional proceedings. By the same token, B.C.L.'s family status should not be permitted to influence the Court into believing that the failure to reveal B.C.L.'s name to the public will reflect adversely upon the integrity of the juvenile justice system. The propriety of disclosure must turn upon the fairness of the proceeding itself with respect to the individual juvenile. If that proceeding is indeed fair, as when the disposition is based upon a sufficient factual record coupled with carefully determined facts and reasoned conclusions which reflect a conscientious attempt to effectuate the purposes of the juvenile laws, this Court should have no worry about would-be detractors of the juvenile justice system.
For these reasons, I dissent.
For affirmance  Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and POLLOCK  6.
For reversal  Justice HANDLER  1.
NOTES
[1] The Attorney General informs us that plans are being made to amend various sections of the juvenile law to conform its language to that of the New Jersey Code of Criminal Justice, N.J.S.A. 2C:1-1 et seq. Until these amendments are enacted, all Code offenses which were classified as "high misdemeanors" under prior law shall remain so classified for the purpose of applying N.J.S.A. 2A:4-65(c).
[2] The Office of the Public Defender filed a vigorous dissent to the Task Force Report. 100 N.J.L.J. at 74.
[3] In an addendum to the Task Force Report, supra, 100 N.J.L.J. at 77, the committee stated that the juvenile's age and prior record would be among the factors to be considered by the juvenile court in deciding not to permit disclosure in the instances where it would otherwise be authorized. These factors are, of course, relevant in determining the juvenile's prospects for rehabilitation.
[4] N.J.S.A. 2A:4-48 currently provides:

Referral to other court without juvenile's consent. The juvenile and domestic relations court may, without the consent of the juvenile, waive jurisdiction over a case and refer that case to the appropriate court and prosecuting authority having jurisdiction if it finds, after hearing, that:
a. The juvenile was 14 years of age or older at the time of the charged delinquent act;
b. There is probable cause to believe that the juvenile committed a delinquent act which would constitute homicide, treason if committed by an adult or committed an offense against the person in an aggressive, violent and willful manner or committed a delinquent act which would have been a violation of section 19 of the Controlled Dangerous Substances Act (P.L. 1970, c. 226; C. 24:21-19) if committed by an adult and the juvenile, at the time he committed the act, was not addicted to a narcotic drug as that term is defined in section 2 of the Controlled Dangerous Substances Act (P.L. 1970, c. 226; C. 24:21-2); and
c. The court is satisfied that adequate protection of the public requires waiver and is satisfied there are no reasonable prospects for rehabilitation of the juvenile prior to his attaining the age of majority by use of the procedures, services and facilities available to the court.
[5] The Task Force Report, supra, 100 N.J.L.J. at 65 stated that it was "aware of public concerns with respect to the confidentiality of juvenile justice proceedings caused by general unawareness and lack of understanding regarding cases processed through the juvenile courts * * *." One of the purposes of the disclosure statute was therefore to promote public confidence in the juvenile justice system. This would be ill served by withholding disclosure under the facts presented.
[6] Cf. State in the Interest of D.G.W., 70 N.J. 488 (1976), where a summary-type hearing was required to determine whether the juvenile should make restitution to the injured party. In such a proceeding, the "juvenile * * * may present such evidence on his own behalf as the trial judge in his discretion deems necessary to the proper resolution of the issue." Id. at 506.

According to the record, the Juvenile Court disposed of the motions for withholding disclosure by B.C.L.'s co-defendants without a hearing. We express no opinion regarding the propriety of those results or the summary procedure employed, but note generally that a hearing is not always necessary.
[1] Although the testimony of the three experts was necessarily predictive, subsequent events as related during oral argument, which properly ought not to influence our decision in this matter, confirm their opinions. B.C.L. successfully completed his high school education and matriculated at Columbia University.
[2] N.J.S.A. 2A:4-65(c); Alaska Stat. § 47.10.090(b) (1975) (release upon second adjudication unless for good cause individual court order prohibits); Del. Code Ann. tit. 10, § 972 (1978) (names of child and parents to be released by Clerk of Family Court to responsible media representative when act is equivalent of felony); Ga. Code Ann. § 25A-3503(g)(2) (1978) (mandatory to release names upon subsequent offense); Miss. Code Ann. § 43-23-17 (names of child and parents or custodians and fact of adjudication, upon second adjudication, to be published in county of residence; cost of publication to be borne by court); Nev. Rev.Stat. § 62.200(4) (1977) (name and charges to be published after two prior adjudications amounting to felonies); Pa. Cons. Stat. Ann. tit. 42, § 6308(b) (Purdon 1979 Supp.) (court shall disclose names of children over fourteen years of age adjudicated of serious crimes as well as details of previous adjudications of serious crimes).
[3] In this case, the record indicated that B.C.L. was highly motivated to rehabilitate himself. Hence, such a conditional probationary disposition, by providing B.C.L. with the direct means for circumventing adverse publicity, could only have whetted his desire for self-improvement. And, such an approach would undoubtedly have been a success. See, e.g., ante at 384 n. 1.