Charles A. **HELTON**, Appellant,

v.

William A. **FAUVER**, Robert J. Del Tufo.

No. 89–5611.

United States Court of Appeals, Third Circuit.

Argued Nov. 15, 1990.

Decided April 10, 1991.

Rehearing and Rehearing In Banc Denied May 15, 1991.

Fredric J. Gross (argued), Fredric J. Gross Law Firm, Mount Ephraim, N.J., for appellant.

Robert J. Del Tufo, Atty. Gen. of the State of N.J., Carol M. Henderson (argued), Deputy Atty. Gen., Div. of Crim. Justice, Appellate Section, Trenton, N.J., for respondents-appellees.

Before STAPLETON, HUTCHINSON and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

This appeal arises from the denial of a petition for a writ of habeas corpus by the district court for the District of New Jersey. 1989 WL 201025. The appellant, Charles A. Helton, was convicted in New Jersey state court after trial as an adult for felony-murder and related offenses. Helton was 16 years old at the time of the crimes. The juvenile court determined it could not waive jurisdiction over Helton to permit him to be tried as an adult. The New Jersey Supreme Court, however, ultimately reversed that decision, interpreting the state juvenile jurisdiction statute to permit such a waiver. After trial as an adult, Helton was sentenced to a term of imprisonment in excess of the maximum term that could have been imposed by the juvenile court.

The primary question on appeal is whether the New Jersey Supreme Court's construction of that state's juvenile jurisdiction statute constituted an unforeseeable

statutory interpretation. If so, then its retroactive application to Helton would constitute an after-the-fact increase in criminal penalties in violation of the due process clause of the Fourteenth Amendment. For the reasons that follow, we believe that the New Jersey Supreme Court's reinterpretation of the standards governing juvenile court jurisdiction may not be applied retroactively to remove defenses from, or increase the penalty imposed on, a criminal defendant. We will therefore reverse the district court's denial of habeas corpus relief.

## I.

Helton was convicted in the Superior Court of New Jersey for felony-murder and other offenses committed on May 3, 1979. At that time, Helton was 16 years and 10 months old. The facts of the crimes, as established at Helton's trial, are essentially undisputed. Briefly stated, these facts are as follows. Helton and his two co-defendants, Bruce Risley and Edward Margie [1] went on a crime spree on the evening of May 3, 1979. During the course of that evening, the three defendants procured a gun and ammunition, and stole an automobile which they used for transportation. They then went to a convenience store, where Margie committed the first robbery. The three then proceeded to a second convenience store, where Risley entered to commit a second robbery, while Helton and Margie waited in the car. Armed with Helton's loaded revolver, Risley confronted the store clerk, Neal Conklin, and shot him at short range when Conklin appeared to be resisting the robbery attempt. Risley then took the money from the cash register, left Conklin lying dead, and ran back to Margie and Helton, who were waiting in the car. All three left the scene, with

Helton driving, and later set the stolen car on fire.

Although he stands convicted of felony murder, other than the weapon used by Risley Helton's only connection to the apparently unpremeditated killing of Conklin was that he drove the getaway car from the robbery. See Dist.Ct.Op., App. at 9a.[2] Helton and his companions were apprehended about fourteen months after the date of the crimes. Juvenile complaints were filed against Helton charging offenses which would constitute the adult crimes of automobile theft, receiving stolen property, arson, armed robbery, and felony murder.

At a hearing before New Jersey's Juvenile and Domestic Relations Court, the state sought to have Helton tried as an adult. The then-applicable juvenile jurisdiction waiver statute, N.J.S.A. 2A:4–48 (repealed 1983), provided that:

The juvenile and domestic relations court may, without the consent of the juvenile, waive jurisdiction over a case and refer that case to the appropriate court and prosecuting authority having jurisdiction if it finds, after hearing that:

a. The juvenile was 14 years of age or older at the time of the charged delinquent act;

b. There is probable cause to believe that the juvenile committed a delinquent act which would constitute homicide ... and

c. The court is satisfied that adequate protection of the public requires waiver *and* is satisfied there are no reasonable prospects for rehabilitation of the juvenile prior to his attaining the age of majority by use of the procedures, services, and facilities available to the court.

*Quoted in State in the Interest of C.A.H. and B.A.R.*, 89 N.J. 326, 446 A.2d 93, 96 (1982) (emphasis added).[3] The juvenile

---

**1.** Risley was a juvenile and Margie was a young adult. Neither of Helton's co-defendants is a party to the instant habeas petition or appeal.

**2.** Helton further points out that Risley, who actually shot the clerk, is nearing parole eligibility, and that Margie, who was an adult at the time of the crime, has already been released

from jail, while Helton is still eight or nine years away from parole eligibility.

**3.** The "age of majority" referred to in part (c) of the statute has been held to be age 21. *See State in the Interest of G.T.*, 143 N.J.Super. 73, 362 A.2d 1171, 1174 (App.Div.), *aff'd,* 75 N.J. 378, 382 A.2d 1124 (1978).

court concluded that juvenile jurisdiction could not be waived because Helton was a good candidate for rehabilitation prior to the age of majority. The Superior Court Appellate Division ultimately affirmed, after remanding to the juvenile court for a written clarification of the findings of fact and the law that supported its previous ruling.

The state then moved for leave to appeal before the New Jersey Supreme Court. Leave to appeal was granted and the New Jersey Supreme Court summarily reversed the Appellate Division's decision. Upon Helton's motion for reconsideration, the court allowed oral argument and issued a full written opinion. *See State in the Interest of C.A.H. and B.A.R.*, 89 N.J. 326, 446 A.2d 93 (1982). In that opinion, the state supreme court did not disturb the juvenile court's finding that Helton was a good candidate for rehabilitation. Rather, it held that the explicit statutory requirement that a defendant be treated as a juvenile if there were substantial prospects for rehabilitation during minority was not absolute, but had to be balanced against society's need for deterrence. The court also held that the need for "general deterrence" (i.e. deterrence of others from committing similar crimes, not just deterrence of the individual defendant from recidivism) is a component of the "adequate protection of the public" criterion found in the statute. Applying these standards to Helton, the New Jersey Supreme Court re-manded to the juvenile court for entry of an order waiving juvenile court jurisdiction over Helton so that he could be tried as an adult. *See* 446 A.2d at 104.

On June 18, 1982, the Middlesex County Grand Jury returned an indictment charging Helton with various crimes that corresponded to the events put in issue by the juvenile complaints. After trial by a jury as an adult, and conviction,[4] Helton was sentenced on December 15, 1985 to a total term of imprisonment of life plus 12 to 18 years. This exceeds the maximum sentence that could have been imposed by the juvenile court. Under the juvenile court's jurisdiction, the maximum sentence Helton could have received would have been an indeterminate sentence, to continue until parole. *See* former N.J.S.A. 2A:4–61(h) (repealed 1983).[5]

The Superior Court Appellate Division affirmed Helton's conviction, and Helton's petition to the New Jersey Supreme Court for certification was denied. He then moved for postconviction relief in the Superior Court of New Jersey, which was denied on January 5, 1987. In its opinion denying postconviction relief, the court stated that the "consideration given to general deterrence in trying Charles Helton as an adult was appropriate and not a violation of the ex post facto principle." Supp. App. at 29. The Appellate Division affirmed, on the merits of the ex post facto issue, not on the basis of any alleged procedural bar.[6] *See* Supp.App. at 259. Helton

---

**4.** Helton was convicted under N.J.S.A. 2A:151–41a (possession of a weapon without a permit); N.J.S.A. 2A:85–14, 2A:119–2, 2A:151–5 (larceny while armed); N.J.S.A. 2A:85–14, 2A:141–1, 2A:151–5 (armed robbery, two counts); N.J.S.A. 2A:85–14, 2A:113–1, 2A:113–2, 2A:151–5 (felony murder while armed); and N.J.S.A. 2A:85–14, 2A:89–2, 2A:151–5 (arson of an automobile while armed).

**5.** The then-applicable statute read (in part) as follows:

> If a juvenile is adjudged delinquent the juvenile and domestic relations court may order any of the following dispositions:
>
> . . . .
>
> h. Commit the juvenile to a suitable institution maintained for the rehabilitation of delinquents for an indeterminate term not to exceed 3 years; except, that any time an adju-dication of juvenile delinquency is predicated upon an offense which, if committed by a person of the age of 18 years or over would constitute any form of homicide . . . then the period of confinement shall be indeterminate and shall continue until the appropriate paroling authority determines that such person should be paroled. . . .

1973 N.J. Laws c. 306 § 20 at 835–36.

**6.** At the postconviction proceedings, the state had argued that Helton's failure to raise his constitutional claim on direct appeal created a procedural bar to a postconviction collateral challenge. Helton pointed out in response that it was only the New Jersey Supreme Court's final decision in *State in the Interest of C.A.H. and B.A.R.*, 89 N.J. 326, 446 A.2d 93 (1982) that gave rise to the constitutional claim he now presents. Since Helton could not be expected to raise on direct appeal an issue that did not

appealed to the New Jersey Supreme Court, which granted the state's motion to dismiss the appeal.

Having exhausted his state remedies,[7] Helton filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the U.S. District Court for the District of New Jersey. On June 21, 1989, the district court denied the petition.

## II.

The federal district court had jurisdiction of Helton's habeas corpus petition pursuant to 28 U.S.C. § 2254. Although the district court judge, on July 27, 1989, denied Helton a certificate of probable cause, *see* 28 U.S.C. § 2253, we certified probable cause to appeal on June 26, 1990. We have appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

■ Helton's appeal presents questions of constitutional law reviewable under a plenary standard. *See Dent v. Cunningham*, 786 F.2d 173, 175 (3rd Cir.1986). We are bound by a state supreme court's construction of a state penal statute. *Missouri v. Hunter*, 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983). We are not, however, bound by the state court's determination as to whether its construction offends the federal Constitution. *Id.*

## III.

The issue to be resolved in this case is fairly narrow. Three principles that are relevant to the outcome are essentially uncontested, however, and will be addressed initially. First of all, there is no dispute that the state supreme court has final authority to interpret state statutes. *See, e.g., Missouri v. Hunter*, 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983); Dist.Ct.Op., App. at 12a.

Secondly, as earlier noted, N.J.S.A. 2A:4–48 (repealed 1983) provided conjunctively that in order to waive jurisdiction, the juvenile court must be "satisfied that adequate protection of the public requires waiver *and* [that] there are no reasonable prospects for rehabilitation of the juvenile prior to his attaining the age of majority." (Emphasis added.) There is no dispute that the New Jersey Supreme Court held, in apparent contradiction to the statutory language, that Helton could be tried in adult court "regardless of his rehabilitative prospects" (as the district court characterized it). Dist.Ct.Op., App. at 16a. The New Jersey Supreme Court's language was that

> even if the juvenile court finds that there are reasonable prospects for rehabilitation, the court must then determine whether the prospects for rehabilitation overcome the public's need for deterrence in the given case.

*State in the Interest of C.A.H. and B.A.R.*, 89 N.J. 326, 446 A.2d 93, 100 (1982). Thus, the New Jersey Supreme Court construed the word "and," in N.J.S.A. 2A:4–48, to mean "or." Despite the statute's conjunctive phrasing, the court apparently read the statute disjunctively, holding that the two legislatively established criteria, rehabilitation and deterrence, required only the application of a balancing test.

■ Thirdly, there is no dispute that if a judicial construction of a criminal statute is unexpected, and thus does not give fair warning, then for a state court to apply

---

materialize until the final holding of the state supreme court, there could be no procedural bar in his failure to raise the issue sooner. Indeed, the state has not pressed the issue on appeal.

In any case, as noted, the state courts did not base their denial of Helton's request for postconviction relief on a procedural bar. Without a plain statement that their decision rested on a state procedural bar, there is no obstacle to Helton's pursuing his federal habeas remedy. *See Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989) ("[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case ' "clearly and expressly" ' states that its judgment rests on a state procedural bar."); *Smith v. Freeman*, 892 F.2d 331 (3rd Cir.1989) (following *Harris*).

7. At oral argument, we questioned counsel as to whether Helton had exhausted his state remedies. Counsel for the state conceded that the New Jersey Supreme Court had had the opportunity to consider the due process claim, and that no issue of exhaustion precluded Helton's federal action.

such an unforeseeable standard to the defendant in the case in which the new standard is announced would violate the due process clause. Thus, in *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), the Supreme Court held that

> an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10 of the Constitution forbids.... If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction.

378 U.S. at 353–54, 84 S.Ct. at 1702–03. *See also Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (reiterating the *Bouie* principle).

*Bouie* and *Marks* were concerned with the ex post facto construction of substantive criminal statutes. Ensuing decisions in the courts of appeals, however, established that the *Bouie* principle applies equally to after-the-fact increases in the degree of punishment. *See Dale v. Haeberlin*, 878 F.2d 930, 934 (6th Cir.1989) ("We hold that the constitutional due process protections, like *ex post facto* protections, do extend to proscribe judicially enforced changes in interpretations of the law that unforeseeably expand the punishment accompanying a conviction beyond that which an actor could have anticipated at the time of committing a criminal act."), *cert. denied*, —— U.S. ——, 110 S.Ct. 1528, 108 L.Ed.2d 767 (1990); *Devine v. New Mexico Dep't of Corrections*, 866 F.2d 339 (10th Cir.1989). The United States Supreme Court, moreover, has now reaffirmed that the ex post facto prohibition applies equally to increases in punishment for conduct that was already criminal. *See Collins v. Youngblood*, —— U.S. ——, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990).

■ Of course, not every retroactive change in the law amounts to a constitutional violation. In its recent analysis of the ex post facto principle in *Collins v. Youngblood*, —— U.S. ——, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), the Supreme Court adopted the analysis found in *Beazell v. Ohio*, 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925), which established three tests for determining violations of the Ex Post Facto Clause. Under *Beazell*, a law is unconstitutional if it: (1) punishes as a crime an act that was innocent when done, or (2) makes more burdensome the punishment for a crime after its commission, or (3) deprives one charged with a crime of any defense available according to law at the time the act was committed.

If any one of the three *Beazell* prongs applies, the law or judicial decision in question is unconstitutional. In Helton's case, the first *Beazell* prong is clearly inapplicable. The second prong, however, applies, as it is indisputable that Helton's punishment was increased as a result of the waiver of juvenile court jurisdiction. The third prong would also be met, if Helton was unforeseeably deprived of the right not to have juvenile jurisdiction waived without a finding that he lacked rehabilitative potential. If that is the case, then Helton was deprived of the defense that the superior court lacked jurisdiction over him.[8]

■ The disputed issue in this case, then, is simply whether or not the New Jersey Supreme Court's construction of the juvenile waiver statute, N.J.S.A. 2A:4–48, in *State in the Interest of C.A.H. and B.A.R.*, 89 N.J. 326, 446 A.2d 93 (1982),

---

**8.** The state mistakenly asserts that under *Collins v. Youngblood*, —— U.S. ——, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) (holding that procedural statutes are exempt from the ex post facto prohibition), the juvenile jurisdiction statute at issue here "is not a penal statute but rather is a procedural mechanism ... [and as such] is not subject to the *ex post facto* prohibition." Brief for Appellee at 29. First of all, the Supreme Court in *Collins* warned that "by simply label-

ling a law 'procedural,' a legislature does not thereby immunize it from scrutiny under the *Ex Post Facto* Clause." 110 S.Ct. at 2721. Secondly, the state concedes that the *Collins* exemption applies only when the procedural rule "does not increase the punishment for [the] offense." Brief for Appellee at 29. As discussed above, trying and convicting Helton as an adult increased the punishment for his offense.

constituted an unforeseeable change in the juvenile waiver of jurisdiction law. The district court concluded that there was no such unforeseeable change, and thus denied Helton's petition. We disagree.

## IV.

Prior to the New Jersey Supreme Court's opinion in *C.A.H.*, a finding of reasonable prospects for rehabilitation prior to age 21 was, without more, an absolute bar to waiver of juvenile court jurisdiction for purposes of trial as an adult. Several authorities support this proposition. First, there is the clear language of the statute itself, which states that the juvenile court may waive jurisdiction only if

> [t]he court is satisfied that adequate protection of the public requires waiver *and* is satisfied there are no reasonable prospects for rehabilitation of the juvenile prior to his attaining the age of majority by use of the procedures, services, and facilities available to the court.

Former N.J.S.A. 2A:4–48 (emphasis added).

One of the cases cited by the state, and relied on by the district court in its denial of habeas corpus relief, was *State in the Interest of J.F.*, 141 N.J.Super. 328, 358 A.2d 217 (1976). But in *J.F.*, the New Jersey court listed the two criteria quoted above (protection of the public and prospects for rehabilitation) as separate criteria, *each* of which must be met before juvenile court jurisdiction may be waived. That court then specifically found "in the light of the record, that the adequate protection of the public requires such waiver *and* that there are no reasonable prospects for rehabilitation of the juvenile, if he was the one who committed the crimes, by use of the proceedings, services and facilities available to the Juvenile Court." 358 A.2d at 219 (emphasis added) (internal numbering omitted). Only after making these explicit findings that met the two independent statutory criteria, did the court order that the juvenile be tried as an adult. Thus, *J.F.* provides no support for the state's thesis that Helton was on notice that the state supreme court would abandon the requirement that each of the above criteria

be met before juvenile court jurisdiction could be waived.

A second case the state points to in purported support of the district court's holding is *State in the Interest of B.T.*, 145 N.J.Super. 268, 367 A.2d 887 (1976), *certif. denied*, 73 N.J. 49, 372 A.2d 314 (1977). Yet in *B.T.*, before ordering waiver to adult court, the juvenile court judge had specifically made the requisite finding that there were "no reasonable prospects for rehabilitation of the juveniles prior to attaining the age of majority." *See* 367 A.2d at 892. The Superior Court Appellate Division affirmed that finding. Although it noted that the juvenile court judge had considered the wrong age of majority (18 instead of 21), the appellate court deemed it appropriate to resolve the merits of the appeal based on its own reading of the record, rather than to remand the case. It then affirmed the juvenile court judge, stating that on its reading of the record there was a

> strong probability that rehabilitation within the framework of the lenient processes and facilities of juvenile-oriented institutions will be fruitless.

367 A.2d at 892. Thus, the appellate court found it necessary to resolve the "rehabilitative potential" factor before determining that waiver was permissible.

The state emphasized in its brief additional language that appears in the *B.T.* opinion, to the effect that

> the court, in an appropriate case, may consider that deterrence and punishment may be more salutary than the slight possibility of successful rehabilitation both from the viewpoint of the juvenile and his future potential victims.

367 A.2d at 892. The *B.T.* court took this view, however, only *after* finding that all four statutory criteria for waiver were met, including the absence of rehabilitative potential. Indeed, the court clearly held that, on its reading of the record, it agreed with the juvenile court judge that there were no reasonable prospects for rehabilitation. In Helton's case, by contrast, the juvenile court judge specifically found that there *were* good prospects for Helton's rehabili-

tation. Moreover, and significantly, that finding has never been disturbed.

The district court's citation of *State in the Interest of B.C.L.*, 82 N.J. 362, 413 A.2d 335 (1980), although arguably a foreshadowing of the *C.A.H.* opinion,[9] is irrelevant to the constitutional issue here. *B.C.L.* was decided in 1980, whereas the underlying crimes in Helton's case were committed in 1979. As *Bouie* held, the Constitution requires *prior* notice of an expansion in the degree of punishment. *See also Collins v. Youngblood*, — U.S. —, 110 S.Ct. 2715, 2719, 2721, 111 L.Ed.2d 30 (1990) (an increase in punishment after the time the crime was committed violates the ex post facto prohibition). Obviously, a 1980 opinion could not provide prior notice for a 1979 crime.[10]

In short, the language of the statute, together with the line of cases interpreting it in the New Jersey state courts, could not have put Helton on notice of, or made reasonably foreseeable, the shift in direction and the change in law effected by the New Jersey Supreme Court in *C.A.H.*[11]

Furthermore, the New Jersey Supreme Court itself made it clear in its opinion in *C.A.H.* that it was breaking new ground, when it held as follows:

> Viewed within this analytical framework—*perhaps not starkly evident before today's decision*—we determine that the trial court reached an incorrect decision concerning the waiver of these juveniles.

446 A.2d at 103 (emphasis added). As the U.S. Supreme Court has noted, courts are often reluctant to admit that their decisions announce new and unprecedented rules. *See Butler v. McKellar*, 494 U.S. 407, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990) ("Courts frequently view their decisions as being 'controlled' or 'governed' by prior opinions even when aware of reasonable contrary conclusions reached by other courts.") The New Jersey Supreme Court's concession that the rule it announced in *C.A.H.* was "perhaps not starkly evident before," 446 A.2d at 103, is a telling indication that its holding in *C.A.H.* was an unforeseeable change in the law.

**9.** The *B.C.L.* court stated that "the 'best interest of the public' embraces 'not only the public's right to know the facts but also the possible salutary effect of publicity in deterrence of the affected juvenile and others.'" 413 A.2d at 342. The state argues that this holding foreshadowed the balancing test laid down in *C.A.H.* (although *B.C.L.* was not about the jurisdictional waiver statute, but rather construed an entirely distinct statute, N.J.S.A. 2A:4–65(c), involving the disclosure of the name of a juvenile).

**10.** Helton also makes a separate argument that under *State v. Loray*, 46 N.J. 179, 215 A.2d 539 (1965) (construing N.J.S.A. 2A:4–15, the predecessor statute to the one at issue here), the New Jersey Supreme Court had specifically rejected the use of "general deterrence" as a factor in decisions about waiver of juvenile court jurisdiction. The *Loray* court stated that "the heinous nature of the offense ... is not enough in itself to justify referral [to adult court]." 215 A.2d at 546. Helton argues that *C.A.H.* took the opposite view, holding that "the gravity of the crime [is] perhaps the most obvious and potent factor in favor of deterrence." 446 A.2d at 103. This argument is weakened, however, by the fact that the *Loray* court did include as a factor "the deterring effect which the [adult court] process" could accomplish. *See* 215 A.2d at 546.

**11.** In a different context, the U.S. Supreme Court has addressed the question of what consti-

tutes an unforeseeable "new rule." *See Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (holding that a new constitutional rule of criminal procedure will generally not be applicable on collateral review to cases which have become final before the new rule is announced). The *Teague* Court defined a rule as "new" if it was not clearly "dictated" by precedent or if reasonable minds could differ as to whether it was clearly commanded by existing law. *See Teague*, 489 U.S. at 301, 109 S.Ct. at 1070.

Although the *Teague* standard does not apply directly to Helton's case, because the ex post facto principle at issue here and in *Bouie* does not implicate the policy favoring the finality of judgments that was at issue in *Teague*, it is evident that reasonable minds have differed as to the meaning of the juvenile waiver requirement. In particular, the juvenile court and the Superior Court Appellate Division both felt compelled to interpret the juvenile waiver factors conjunctively, as distinct from the disjunctive interpretation announced by the New Jersey Supreme Court in *C.A.H.* Moreover, the earlier juvenile jurisdiction cases discussed in text above also read the waiver factors in the statute conjunctively, as the terms of the statute state.

Judge Stapleton regards *Teague* as inapposite to the question whether a court's construction of a criminal statute violates the Due Process Clause and *Bouie v. City of Columbia*.

The *C.A.H.* opinion, for the above reasons, was an unforeseeable departure from precedent. It established a balancing test between two factors which theretofore had been considered independent requirements, both of which had to be met before juvenile court jurisdiction could be waived. Therefore, under *Bouie*, it was a violation of the due process clause of the Fourteenth Amendment to apply the new *C.A.H.* test without prior notice to Helton, inasmuch as *C.A.H.* increased the punishment Helton received for his crimes and deprived him of a jurisdictional defense.

## V.

We turn now to the question of the appropriate remedy. Helton asks us to vacate his conviction and dismiss the indictment. The state has not addressed the issue of remedy, relying instead on its arguments that there was no constitutional violation. The district court, in a footnote, expressed the view that if a due process violation were found,

> the fact of an increased sentence alone would not necessarily render petitioner's conviction void, since the Court could presumably convert petitioner's sentence to an indeterminate life sentence [i.e. the maximum to which Helton could have been sentenced in juvenile court]. In that event the Court would have to determine whether the loss of procedural safeguards would warrant voiding the entire proceeding.

Dist Ct.Op., App. at 13a n. 3.

■ If it was a violation of due process—as indeed we have determined that it was—to try Helton as an adult, then his conviction was unconstitutional. Moreover, as the juvenile court could not constitutionally waive jurisdiction under the retroactively applied *C.A.H.* decision, the superior court that tried Helton as an adult lacked jurisdiction over him. Helton's conviction must therefore be vacated, and his indictment dismissed. This disposition, of course, will be without prejudice to the state's right to pursue juvenile proceedings, under which Helton will be subject to a different set of procedures and protections.

## VI.

For the foregoing reasons, we conclude that the application to Helton of the New Jersey Supreme Court's newly-announced standard for waiver of juvenile court jurisdiction violated the ex post facto prohibition established by the Fourteenth Amendment, as stated by the United States Supreme Court in *Bouie*. The State of New Jersey, whether through its legislature or its Supreme Court, may choose to shift the focus of its juvenile justice system away from rehabilitation and toward deterrence. Under the due process clause of the Fourteenth Amendment, however, it may not do so retroactively, if it thereby increases the penalty or deprives a defendant of a defense that existed at the time of the underlying events.

Accordingly, we will reverse the district court's denial of relief under 28 U.S.C. § 2254. We will remand this case to the district court with instructions that the district court issue the writ within no more than ninety (90) days, unless within that time the state has vacated Helton's conviction and dismissed the indictment. During that time, the state may of course take steps to institute juvenile proceedings against Helton.

HUTCHINSON, Circuit Judge, dissenting.

I respectfully dissent from the Court's holding that New Jersey unconstitutionally deprived Helton of liberty without due process. *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), requires us to determine whether the Supreme Court of New Jersey's construction of the state's juvenile law, in apparent conflict with the statute's text, was "unforeseeable" when Helton committed the unlawful acts for which he is now imprisoned. As the Court recognizes, *Bouie* does not authorize us to hold that a state court's authoritative construction of a state statute is wrong. *See Missouri v. Hunter*, 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d

535 (1983). I dissent because I do not believe that the balancing between society's need for deterrence and the juvenile's interest in rehabilitation the Supreme Court of New Jersey forced upon the statutory text in *State in the Interest of C.A.H. & B.A.R.*, 446 A.2d 93 (N.J.1982), was "unforeseeable."

I agree with most of the Court's opinion up to, but not including, the last sentence of Part III. In that sentence, the Court states its disagreement with the district court's conclusion that the Supreme Court of New Jersey's construction of N.J.Stat. Ann. § 2A:4–48(c) (repealed 1983), part of that state's juvenile statute, in *State in the Interest of C.A.H. and B.A.R.*, was not unforeseeable.

The Court's rationale in support of that conclusion is contained in Part IV of its opinion. There, the Court reasons that settled New Jersey juvenile law precluded Helton's trial on criminal charges if he had a reasonable prospect of rehabilitation when he committed the lawless acts that resulted in his imprisonment. Because the juvenile judge's finding to that effect was not reversed,[1] the Court holds that the Supreme Court of New Jersey's 1982 holding that New Jersey juvenile courts must balance society's interest in deterring juvenile crime against the juvenile's prospects for rehabilitation under juvenile law cannot be applied to hold Helton criminally responsible for acts he committed in 1979. *See State in the Interest of C.A.H. & B.A.R.*, 446 A.2d 93.

Since a lack of foreseeability is the *sine qua non* of the *Bouie* prohibition, it seems to me useful to begin by looking at that somewhat elusive concept in some detail. I see at least three ways to interpret the term "unforeseeability" as *Bouie* uses it to limit and define the due process prohibition against retroactive application of statutory constructions that expand criminal liability, enhance punishment, or limit defenses.

As a matter of first impression, foreseeability could be considered solely from the actor's standpoint. We could ask ourselves whether Helton himself relied on the existing state of New Jersey law as evidenced by the statutory text. *Bouie* forecloses this interpretation, at least insofar as it implies that Helton can be retroactively deprived of the benefits of New Jersey juvenile law unless he subjectively considered the statute's seeming assurance of rehabilitative treatment, without regard to society's interest in deterrence. In *Bouie*, Justice Brennan, writing for the Supreme Court, said:

> The determination whether a criminal statute provides fair warning of its prohibitions must be made on the basis of the statute itself and the other pertinent law, rather than on the basis of an *ad hoc* appraisal of the subjective expectations of particular defendants.

*Bouie*, 378 U.S. at 355 n. 5, 84 S.Ct. at 1703 n. 5.

Secondly, we could consider any plain deviation from the statutory text "unforeseeable" and so subject to *Bouie*'s prohibition against retroactive application. I think this would read "unforeseeability" out of the *Bouie* analysis. It would equate state judicial decisions construing state statutes against their text with state legis-

---

1. The juvenile court's finding that Helton had a reasonable prospect of rehabilitation was, however, not graciously accepted by either the Appellate Division or the Supreme Court of New Jersey. When the case first came up on appeal, the Appellate Division sent it back to juvenile court for clarification of the finding that Helton could be rehabilitated. *State of Interest of C.A.H. & B.A.R.*, 446 A.2d at 95. After the juvenile court reaffirmed the finding, the Appellate Division affirmed, *id.* at 95–96, but the Supreme Court of New Jersey summarily reversed. After granting reconsideration, New Jersey's high court issued the opinion at issue here. *Id.* at 96. In it, the court commented extensively and crit-

ically on the expert psychiatric testimony the juvenile court relied on in finding Helton could be rehabilitated. It said:

> Both of the State's witnesses testified that CAH could be rehabilitated by the time he reached 21. Even if their opinions support the ultimate conclusion that there was a realistic prospect for CAH's rehabilitation, this is not dispositive. The failure of these experts to address crucial factors in making their assessments detracts substantially from the weight which should be accorded their testimony. See *infra* at 101–102.

*Id.* at 101 n. 3.

lative acts amending state criminal statutes. Foreseeability is a limiting factor in the due process clause's prohibition against "unforeseeable" *ex post facto* judicial increases in criminal punishment. It is not a factor in *ex post facto* analysis when legislative acts are involved. *See Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798); *see also Miller v. Florida,* 482 U.S. 423, 431, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987) ("The constitutional prohibition against *ex post facto* laws cannot be avoided merely by adding to a law notice that it might be changed.") No amount of notice or publicity, not even foreseeability to the point of certainty, can justify *ex post facto* criminal application of a legislative act. Thus, even when Charles Lee murdered Joyce Hunsicker either in the late hours of September 12, 1978, or the early hours of September 13, 1978, after the Pennsylvania Senate had overridden Governor Milton Shapp's veto of a death penalty statute, he could not be sentenced to death because the Pennsylvania House of Representatives did not override the veto until noon on September 13, 1978. *See Commonwealth v. Lee,* 516 Pa. 305, 532 A.2d 406 (1987).[2]

Thirdly, we could define "unforeseeability" in general terms, apart from the textual construction at issue, and ask whether a reasonable person in Helton's position could, as a matter of foresight, not hindsight, have any reasonable assurance that the criminal acts he planned to execute with his two comrades would bring no consequences upon him beyond the sanctions of the juvenile law; and, if the answer to this question were no, retroactively apply the questioned construction of the statute to Helton.

In Helton's case, this definition of foreseeability would permit application of the 1982 test to Helton's 1979 acts. Helton's fate depended on the exercise of judicial discretion. He could have no *a priori* assurance that a juvenile judge would find he had a reasonable prospect of rehabilitation despite the truly outrageous nature of his acts. In 1979, New Jersey criminal law authorized the sentences Helton is serving, and Helton, as a reasonable person,[3] was bound to know that he was subject to those criminal penalties if a juvenile judge waived jurisdiction over him. He was on notice the law could place restrictions on his liberty as provided by New Jersey criminal law. He could have no reliable assurance that waiver would not occur. I believe this definition of unforeseeability is compatible with *Bouie*'s genesis in the related due process doctrine that criminal convictions are void if the criminal statute under which they are obtained is so vague that it fails to give fair notice of the conduct that it prohibits. *See Bouie,* 378 U.S. at 351–52, 84 S.Ct. at 1701–02. There, the Supreme Court said:

> It is true that in the *Connally* [*v. General Const. Co.,* 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926)] and *Lanzetta* [*v. New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939)] cases, and in other typical applications of the principle, the uncertainty as to the statute's prohibition resulted from vague or overbroad language in the statute itself, and the Court concluded that the statute was "void for vagueness." The instant case seems distinguishable, since on its face the language of § 16–386 of the South Carolina Code was admirably narrow and precise; the statute applied only to "entry upon the lands of another * * * after notice * * * prohibiting such entry * * *." The thrust of the distinction, however, is to produce a potentially greater deprivation of the right to fair notice in this sort of case, where the claim is that a statute precise on its face has been unforeseeably and retroactively expanded by judicial construction, than in

---

**2.** In *Lee,* the court was able to avoid the *ex post facto* question because the statute itself prohibited a contrary result. However, *Calder* and *Miller* would have forced the court to reach the same result on federal constitutional grounds if the statutory grounds had not been present.

**3.** I recognize that here, as elsewhere in the law, the concept of a reasonable person has elements of fiction, in this case specifically the fiction that a reasonable person is aware of the applicable law. *See, infra,* at 1053 (discussing *McBoyle v. United States,* 283 U.S. 25, 51 S.Ct. 340, 75 L.Ed. 816 (1931)).

the typical "void for vagueness" situation. When a statute on its face is vague or overbroad, it at least gives a potential defendant some notice, by virtue of this very characteristic, that a question may arise as to its coverage, and that it may be held to cover his contemplated conduct. When a statute on its face is narrow and precise, however, it lulls the potential defendant into a false sense of security, giving him no reason even to suspect that conduct clearly outside the scope of the statute as written will be retroactively brought within it by an act of judicial construction.... [T]he violation is that much greater when, because the uncertainty as to the statute's meaning is itself not revealed until the court's decision, a person is not even afforded an opportunity to engage in such speculation before committing the act in question.

*Id.*

No contention is here advanced that a juvenile statute that leaves the waiver issue to the juvenile judge's broad discretion is too vague, and indeed I do not think such an argument could be successfully advanced. It is plain, however, that the New Jersey juvenile statute that governs Helton's case is not the kind of precise statute that Justice Brennan had under discussion in *Bouie*. In Helton's case, the distinction Justice Brennan makes between general and precise statutory language works against Helton. This is not a case like *Bouie*, "where the construction unexpectedly broadens a statute which on its face had been definite and precise." *Id.* at 353, 84 S.Ct. at 1702. I believe it is the "unforeseeable enlargement" of such precise statutes by judicial construction that lies at the core of *Bouie* and makes the unforeseeable enlargement "operate[ ] precisely like an *ex post facto* law." *Id.* Helton does not present such a case. Unfortunately, this point is not expressly briefed by the parties and *Bouie* does not speak to it with complete clarity. *See Beazell v. Ohio,* 269 U.S. 167, 169, 46 S.Ct. 68, 68, 70 L.Ed. 216 (1925) (second possible application of the prohibition against *ex post facto* laws is when the law makes more burden-some the punishment for a crime after it is committed).

The parties' briefs do discuss the issue of whether the balancing test *State in the Interest of C.A.H. & B.A.R.* incorporated into the statute was merely a procedural change that could be retroactively applied under the teaching of *Collins v. Young-blood,* —— U.S. ——, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). In this context, the state raised the question of whether juvenile law in general merely creates procedural rights that can be retroactively taken from juveniles without running afoul of the constitutional prohibition against *ex post facto* laws. That question could be thought of in relation to the risk of life imprisonment under the criminal law that Helton took when he decided to participate in robberies at gunpoint, if the juvenile court waived jurisdiction. In Helton's case, I do not find analysis of *ex post facto* principles in terms of the procedural-substantive dichotomy to be very helpful. The *ex post facto* concept expresses our long-standing and deep-seated aversion to punishing an actor beyond the punishment provided when he acted. It is based on the commonly perceived injustice inherent in interference with justifiable reliance. So viewed, I believe the analogous due process issue is better dealt with by considering whether Helton's reliance on the possibility of rehabilitative treatment under juvenile law, as opposed to criminal punishment, was reasonable and justifiable in light of the nature of the acts he decided to participate in.

In that sense, this case is distinguishable from *Bouie*. There, a group of black persons seeking to peacefully integrate a lunch counter in a private establishment that placed no restriction on entry by black people was acquitted of breach of the peace but convicted of criminal trespass because the Supreme Court of South Carolina unforeseeably held the group's refusal to leave converted their initially lawful "entry" into criminal trespass under South Carolina's precise statute defining criminal trespass. *See Bouie,* 378 U.S. at 355–56, 84 S.Ct. at 1703–04. Historically, the com-

mon law rejected criminal liability for trespass on this basis. *See Six Carpenters Case,* 77 Eng.Rep. 695 (1610) (no criminal liability for trespass *ab initio* );[4] *see also Bouie,* 378 U.S. at 358, 84 S.Ct. at 1705. Thus, the Supreme Court held "unforeseeable" the Supreme Court of South Carolina's expansive interpretation of the word "entry" in the state's trespass statute to include remaining when asked to leave.

In *Bouie,* the Supreme Court said:

The interpretation given the statute by the South Carolina Supreme Court in the Mitchell case, note 2, supra, so clearly at variance with the statutory language, has not the slightest support in prior South Carolina decisions. Far from equating entry after notice not to enter with remaining on the premises after notice to leave, those decisions emphasized that proof of notice before entry was necessary to sustain a conviction under § 16–386.

*Bouie,* 378 U.S. at 356, 84 S.Ct. at 1704. The high Court went on to say:

The clear distinction between civil and criminal trespass is well recognized in the common law. Thus it is stated, in 1 Bishop, Criminal Law, § 208 (9th ed. 1923) that

"In civil jurisprudence, when a man does a thing by permission and not by license, and, after proceeding lawfully part way, abuses the liberty the law had given him, he shall be deemed a trespasser from the beginning by reason of this subsequent abuse. But this doctrine does not prevail in our criminal jurisprudence; for no man is punishable criminally for what was not criminal when done, even though he afterward adds either the act or the intent, yet not the two together."

Unless a trespass is "committed under such circumstances as to constitute an *actual* breach of the peace, it is not indictable at common law, but is to be redressed by a civil action only." Clark and Marshall, Crimes (5th ed. 1952, at 607).

*Id.* at 358, 84 S.Ct. at 1705 (footnote omitted).

The New Jersey law governing waiver of juveniles to criminal court was not nearly so firmly established as the South Carolina law of criminal trespass when Helton and his friends went off on what the Court correctly calls a "crime spree." A person reasonably familiar with New Jersey law could not say the balancing test used to take from Helton the advantages of the juvenile law was "unforeseeable" and could not have been unfairly surprised when the Supreme Court of New Jersey held Helton's participation in two violent acts of armed robbery, one murder, a car theft, and the destruction of the stolen car by arson required waiver of juvenile court jurisdiction in favor of criminal punishment. This is so even if we broadly define "unforeseeable" future changes as those changes that would strike a reasonable person, familiar with the statutory text and the relevant case law, as outlandish or unanticipated when contemplating a particular future course of action. *See Bouie,* 378 U.S. at 351, 84 S.Ct. at 1701 (quoting *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954)). I believe a definition of foreseeability in terms of the "outlandish" or "bizarre" gives the broadest possible scope to the *Bouie* prohibition against retroactive judicial changes in criminal law. So defined, I think the Court misapplies the *Bouie* concept of foreseeability to decide that Helton is entitled to a writ of *habeas corpus* under 18 U.S.C.A. § 2254 (West 1977) because his criminal punishment was unforeseeable.

**4.** The doctrine of trespass *ab initio* was a peculiar and anomalous fiction developed by the common law by which one who entered properly upon land in the exercise of a privilege conferred by authority of law, and subsequently abused the privilege by conduct which was itself a trespass to person, land, or chattels, became liable not only for the later misconduct, but also for the original lawful entry. The abuse of the privilege was related back to forfeit it entirely, and the actor became a trespasser 'ab initio,' or from the beginning.
*Robinson v. Dean Witter Reynolds, Inc.,* 129 F.R.D. 15, 20 (D.Mass.1989).

The grammatical structure of N.J.Stat. Ann. § 2A:4-48(c) and the ordinary meaning of its individual words and clauses do seem at first to rule out a balancing test. Accordingly, the Court goes on to conclude that the statute's use of the word "and" precludes the Supreme Court of New Jersey's textual exegesis and constitutionally prohibits the punishment of Helton in the New Jersey adult criminal system because he had a reasonable prospect of rehabilitation under the juvenile law. *See* Majority Opinion, at 1046–1048. I think this conclusion requires closer examination. If this panel were sitting as the Supreme Court of New Jersey, interpreting that state's statutes, I could better understand the Court's conclusion. In the words of Justice Holmes, no less apt because old:

> Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear.

*McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931). We do not, however, sit to construe New Jersey's juvenile law. We sit to decide whether New Jersey's interpretation is "unforeseeable" and so cannot be applied to Helton after the fact without violating due process.

Recognizing the statute's use of the conjunctive, but remembering that it is not this Court's function to decide whether a state court's construction of its own statute is wrong, I would examine the statute to see whether the Supreme Court of New Jersey's conversion of "and" into "or" is, indeed, so outlandish or bizarre as to be "unforeseeable."

As a matter of first impression, a rule of law requiring society to take its chances on the successful rehabilitation of a juvenile who willfully plans and engages in a series of armed robberies that result in a felony murder without also weighing society's interest in deterring and preventing juveniles from such violent and dangerous conduct strikes me as odd. Although the Court does not rely solely on textual exegesis to reach its conclusion that the state court's interpretation of the statute was unforeseeable, it seems to me clear that textual preclusion of a balancing test is essential to the Court's result. Let us examine the Supreme Court of New Jersey's 1982 construction of the statute with the aid of some hypotheticals.

Let us first suppose any particular juvenile who runs afoul of the law can be rehabilitated. Then, by the Court's construction of the statute, no inquiry into society's interest in protecting itself against future car thefts, armed robberies, murders or arsons at the hands of Helton or other juveniles is material. Conversely, let us suppose Helton cannot be rehabilitated. Inability to benefit from rehabilitation necessarily implicates society's need for protection against continuing depradations by the particular juvenile whose case is under consideration. If the juvenile cannot be rehabilitated, it makes no sense to require the juvenile court separately to satisfy itself that society's safety requires the juvenile's punishment. Accordingly, consideration of society's needs is unnecessary in either case, and the words of the statute that command it become no more than a legislatively mandated act of judicial supererogation that deprives § 2A:4-48(c)'s first conditional antecedent concerning the interests of society of functional meaning. This construction runs afoul of the generally accepted rule of statutory construction that a statute is to be interpreted so as to give meaning to each word. *See Moskal v. United States,* —— U.S. ——, 111 S.Ct. 461, 466, 112 L.Ed.2d 449 (1990) (quoting *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955)); *McGlynn v. New Jersey Pub. Broadcasting Auth.,* 88 N.J. 112, 439 A.2d 54, 63 (1981) (citing 2A Sutherland, Statutory Construction, § 46.06 (4th ed. 1973)). Thus, the absence of rehabilitative prospects as well as their presence makes consideration of society's interest in deterring juvenile crime functionally immaterial under the majority's reasoning.

The conjunctive construction of § 2A:4–48(c) seemingly implied by that subsection's use of the logical connector "and," as a practical matter, reads out of the calculus the legislature's concurrent command to juvenile judges to satisfy themselves that society, not just the juvenile, will be better served by criminal instead of juvenile law. The statute's words invoking society's interest then become mere hollow echoes of an empty ritual whose tenets are mouthed, not believed. This anomaly, together with the statute's peculiar format dividing all the other requirements for waiver except the two contained in clause (c) into separately lettered subsections, the Supreme Court of New Jersey's reference to legislative history and the opinions of the writers of an article on New Jersey juvenile law with respect to waiver, *see State in the Interest of C.A.H. & B.A.R.*, 446 A.2d at 99–103 & nn. 2 & 6, lead me to question the Court's conclusion that the statute's text flatly precludes the balancing test the Supreme Court of New Jersey read into it.

The Court does not, however, rest only on the statutory text but states there are "several authorities" that support the proposition that New Jersey law absolutely prohibited Helton's trial and punishment under the criminal law regardless of society's interest if he was a fair prospect for rehabilitation under the juvenile law. It goes on to list them. *See* Majority Opinion, at 1046–1047. Unlike the Court, I find none of the "authorities" outside the statutory text persuasive on the proposition that pre–1982 New Jersey law plainly established the state had to give Helton and all other juveniles the benefit of rehabilitation without regard to the nature of their violent acts, the danger of their recidivism if rehabilitation failed or the encouragement of similar juvenile violence by other juveniles relying on the absence of penal consequence. To the contrary, I think there are strong intimations in New Jersey case law that the courts of that state would not read § 2A:4–48(c) to preclude criminal punishment whenever there was a fair prospect that a juvenile actor could be rehabilitated within the framework of the juvenile law without any thought of society's interest in deterring violent juvenile crime.

As the Court says, these statements are indeed dictum, but that is no basis for failing to consider them in deciding whether a later judicial holding on the issue of statutory construction is "unforeseeable" within the meaning of *Bouie*. By definition, the suspect construction could not have been the subject of authoritative judicial pronouncement before the decision whose holding brings it under *ex post facto* attack. Were the construction previously established, the *Bouie* problem would disappear. Similarly indeterminate on the issue of unforeseeability is the Court's reliance on the fact that both the adequate protection of the public and a reasonable prospect of rehabilitation were not present in *State in the Interest of J.F.*, 141 N.J.Super. 328, 358 A.2d 217 (Ct.App.Div.1976). In *State in the Interest of J.F.*, the court did not have to consider the stark choice of ignoring the public's interest in deterrence in favor of the juvenile's interest in rehabilitation. Nevertheless, there the Appellate Division did tell us what it was likely to do if that choice were presented. It said:

> In *State v. Van Buren, supra,* 29 N.J. [548] at 557, 150 A.2d 649 [ (1959) ], decided under the former statute and rule, it was said that a case may be referred to the prosecutor when the circumstances indicate that if the charge is ultimately established, society would be better served by the criminal process by reason of the greater security which may be achieved or the deterring effect which that process is thought to accomplish. Notwithstanding the changes that have been wrought with respect to the criteria governing the judge's determination whether to transfer to the prosecutor or not, the foregoing thesis is as viable today as it was when pronounced.

In dealing with crime the protection of society must always be a primary consideration, whether the criminal acts are committed by juveniles or adults. If there is a possibility of rehabilitation and the undertaking to that end does not conflict with the required protection of

society, and there is no other persuasive reason for taking some other course, then rehabilitation under the continued protection of the Juvenile Court may be considered.

*Id.* 358 A.2d at 219.

The court then went on to reaffirm the continuing vitality of the balancing test as set forth in two cases decided under a textually different earlier version of the New Jersey statute.[5] It said:

> We of course recognize that even though the charge amounts to murder and the heinous nature of the offense appears on the face of the complaint, that alone is not enough to justify referral. *State v. Loray,* 46 N.J. 179, 191, 215 A.2d 539 (1965). However, the details surrounding the commission of the offense and the nature of the crime are proper considerations. The crimes committed as recounted in the record were extraordinarily vicious. We are therefore satisfied, in the light of the record, that (3) the adequate protection of the public requires such waiver and (4) there are no reasonable prospects for rehabilitation of the juvenile, if he was the one who committed the crimes, by use of the proceedings, services and facilities available to the Juvenile Court pursuant to law.

> Moreover, we also have concluded that society would in this case be better served by the criminal process, by reason of the greater security which may be achieved or the deterring effect which the normal criminal process is believed to accomplish. *State v. Van Buren, supra.*

We therefore find that the action of the trial judge in denying the application of the prosecutor constituted an abuse of discretion (*State v. Van Buren, supra,* 29 N.J. at 559, 150 A.2d 649) and from the standpoint of society clearly brought

about an unjust result (*State v. Johnson,* 42 N.J. 146, 162, 199 A.2d 809 (1964)).

*Id.* at 220.

*State in the Interest of B.T.,* 145 N.J.Super. 268, 367 A.2d 887 (Ct.App.Div.1976), *certif. denied,* 73 N.J. 49, 372 A.2d 314 (1977), gives an even stronger indication that New Jersey would not ignore the needs of society in order to pursue a prospect of rehabilitation. There, the juvenile court held that rehabilitation was unlikely within the time left before the juvenile attained age eighteen. *Id.* 367 A.2d at 892. That holding was based on the incorrect premise that juvenile supervision had to end at age eighteen. In fact, juvenile supervision could continue for another three years, until the juvenile attained age twenty-one, under the applicable statute. *Id.* New Jersey's Appellate Division affirmed the juvenile court's waiver of jurisdiction in favor of criminal prosecution without giving the juvenile court a chance to reconsider its discretionary waiver on a correct assumption of the time remaining for the rehabilitation process to work. After stating that attempting rehabilitation before age twenty-one would be fruitless, the Appellate Division again went on to say:

> As a consequence, the court, in an appropriate case, may consider that deterrence and punishment may be more salutary than the slight possibility of successful rehabilitation both from the viewpoint of the juvenile and his future potential victims. Chief Justice Weintraub observed in *State v. Van Buren, supra,* in discussing the transfer statute which preceded the one controlling this case:

> > Thus a case may be referred to the prosecutor when the circumstances indicate that, if the charge is ultimately

**5.** The earlier statute provided, in relevant part:

> If it shall appear to the satisfaction of the juvenile and domestic relations court that a case of juvenile delinquency as defined in section 2A:4–14 of this title committed by any juvenile of the age of 16 or 17 years, should not be dealt with by the court, either because of the fact that the person is an habitual offender, or has been charged with an offense of a heinous nature, under circumstances

which may require the imposition of a sentence rather than the disposition permitted by this chapter for the welfare of society, then the court may refer such case to the county prosecutor of the county wherein the court is situate.

N.J.Stat.Ann. § 2A:4–15 (repealed 1973), *quoted in State v. Van Buren,* 29 N.J. 548, 150 A.2d 649, 651 (1959).

established, society would be better served by the criminal process by reason of the greater security which may be achieved or the deterring effect which that process is thought to accomplish. [29 N.J. at 557, 150 A.2d at 654.]

As we noted in *State in Interest of J.F.,* *supra:*

Notwithstanding the changes that have been wrought with respect to the criteria governing the judge's determination whether to transfer to the prosecutor or not, the foregoing thesis is as viable today as it was when pronounced. [141 N.J.Super. 328, at 332, 358 A.2d 217, at 219.]

*Id.*

These statements lead me to believe that Helton could have no assurance, beyond the statute's use of the conjunctive "and," that he would escape criminal punishment and be treated as a juvenile offender no matter what he did if he could just persuade a judge that his prospects for rehabilitation were "reasonable."

The construction New Jersey placed on its juvenile law may be wrong. It is not "unforeseeable." Therefore, I believe the retroactive application of it to Helton is not prohibited by *Bouie*'s due process extension of the *ex post facto* prohibition from legislative enactments to an unforeseeable judicial interpretation of a legislative enactment. Accordingly, I would affirm the order of the district court denying Helton's petition for a writ of *habeas corpus.*