834 A.2d 1053

STATE OF NEW JERSEY IN THE INTEREST
OF W.M., JUVENILE–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 14, 2003—Decided November 12, 2003.

Before Judges NEWMAN, FALL and HOENS.

*Patricia Weston Rivera,* argued the cause for appellant.

*Hilary L. Brunell,* Executive Assistant Prosecutor, argued the cause for respondent, State of New Jersey (*Paula T. Dow,* Acting Essex County Prosecutor, attorney; *Ms. Brunell,* on the brief).

The opinion of the court was delivered by

FALL, J.A.D.

In this juvenile delinquency waiver case, as a matter of first impression, we review the decision of the Family Part, after a hearing held pursuant to *N.J.S.A.* 2A:4A–36, to remand the waived juvenile to the adult detention facility pending trial. The following factual and procedural history is relevant to our consideration of the issues advanced on appeal.

W.M. was born on February 27, 1986. On January 10, 2003, he was charged in the Family Part with acts of delinquency purport-

edly occurring in September 2002 when he was age sixteen which, if committed by an adult, would constitute second-degree aggravated assault, contrary to *N.J.S.A.* 2C:12–1(b), and third-degree endangering the welfare of a child under age sixteen, contrary to *N.J.S.A.* 2C:24–4. The delinquency charges filed against W.M. arose from the following circumstances.

On January 5, 2003, the badly decomposed body of F.W., a seven-year-old male child was discovered at 188 Parker Street in Newark. R.W., F.W.'s twin brother, and their four-year-old brother, T.H., were also found at the Parker Street address; they were alive but in poor health. A police investigation disclosed that in September 2002, these three children had been living in Irvington in the care of W.M.'s mother. W.M. often played rough with F.W. and his brothers. At that time and place, W.M. was wrestling with F.W. when W.M. placed F.W.'s head in a "headlock," drove his knee into F.W.'s abdomen several times, and then flipped F.W. over his right shoulder, causing F.W.'s head to hit the edge of the bed and then bounce a few times when it struck the floor. W.M. heard F.W. make a "gurgling" sound like he was trying to breathe, prompting W.M. to get his mother, who placed ice on F.W.'s head; W.M. then left the house and never saw F.W. again.[1]

An autopsy of F.W.'s body disclosed that the cause of the child's death was homicidal violence, including blunt impacts to the head and abdomen. The injuries that caused F.W.'s death were consistent with being caused by the described conduct of W.M. toward F.W. in September 2002, during the wrestling incident.[2]

After the delinquency complaint was filed against W.M., the State filed a timely motion in the Family Part pursuant to

---

[1] This information had been obtained from W.M.'s statement given to representatives of the Essex County Prosecutor's Office on January 10, 2003.

[2] The investigator's report concerning W.M.'s statement and the medical examiner's post-mortem report of F.W. were admitted into evidence during the waiver hearing, but are not contained in the record on appeal.

*N.J.S.A.* 2A:4A–26 and *Rule* 5:22–2, seeking waiver of that court's jurisdiction over the delinquency complaints filed against W.M., and referral of the matter to the Law Division and prosecuting authority for the prosecution of W.M. as an adult. A hearing was conducted in the Family Part before Judge Troiano on the State's waiver application on March 4, 2003, after which the judge entered an order granting the State's motion and directing that the matter be transferred to the Law Division and the Essex County Prosecutor's Office for further proceedings against W.M. as an adult.

On March 10, 2003, an adult criminal complaint was filed against W.M., charging him with second-degree aggravated assault and third-degree endangering the welfare of a child. W.M.'s motion for leave to appeal from the March 4, 2003 waiver decision was denied by an order entered in this court on May 28, 2003. *See State in the Interest of R.L.,* 202 *N.J.Super.* 410, 414, 495 *A.*2d 172, 175 (App.Div.) (holding that a juvenile waiver order is an interlocutory order which may be appealed only by leave granted), *certif. denied,* 102 *N.J.* 357, 508 *A.*2d 226 (1985).

Upon granting the State's waiver application, a hearing was conducted in the Family Part before Judge Troiano on May 6, 2003 and June 6, 2003, pursuant to *N.J.S.A.* 2A:4A–36 and *Rule* 5:22–3, to determine whether W.M., while in custody pending trial, should be remanded to the Essex County Juvenile Detention Facility (juvenile facility) or to the Essex County Jail (adult facility), pending resolution of the adult charges. W.M. had been housed at the juvenile facility since the delinquency charges were filed against him in January 2003. During the hearing, counsel for W.M. presented several witnesses in support of his position that he should remain at the juvenile facility.

Dr. Matthew B. Johnson, a psychologist, examined W.M. at the juvenile facility on several occasions and administered various tests designed to measure achievement, intelligence, and depression. Dr. Johnson's April 17, 2003 report setting forth his findings was admitted in evidence.

Dr. Johnson testified that W.M. has significant academic deficits, with an I.Q. of 79, "which is below the average level but above the level for mental deficiency and mental retardation." Dr. Johnson also found that W.M. had a moderate level of depression.

Citing to W.M.'s social immaturity, his academic and intellectual deficits, the need for continuity of W.M.'s educational program at the juvenile facility, W.M.'s protected-custody status at the juvenile facility, the high level of publicity of the case, and the danger of assault against W.M., Dr. Johnson testified that transferring W.M. to the adult facility would be contrary to his best interests.

Eleanor Elcock, a substance awareness coordinator at the juvenile facility, described the educational programs made available to its inmates, and W.M.'s participation therein. Ms. Elcock explained that an alternative high school program, known as Sojourn High School, provides on-site, high-school level instruction to juveniles incarcerated at the juvenile facility. Ms. Elcock stated that W.M. was enrolled in Sojourn's high school equivalency diploma (G.E.D.) program and attended classes from approximately 8:00 a.m. to approximately 2:15 p.m., five days each week. Ms. Elcock testified that W.M. was progressing well at the juvenile facility and expressed concern for W.M.'s safety if transferred to the adult facility. Ms. Elcock noted that W.M. was making progress toward obtaining his diploma and was being prepared to take the G.E.D. test in August 2003. Ms. Elcock asserted that juveniles brought from the adult facility to the juvenile facility to attend the educational program received only two hours of instruction each day.

Keith Ali, Warden of the adult facility, testified that juveniles waived to adult court who are incarcerated at the adult facility are all housed "on the third floor of the jail on a tier restricted policy[,]" where there are ten cells. He explained that the juveniles are sight-and-sound segregated from the adult population, and are provided recreational, library and school privileges. The waived juveniles also receive their meals on their tier or in the day room adjacent to their cells.

Warden Ali stated that the waived juveniles are transported each day to the juvenile facility, where they receive the benefit of the Sojourn educational program from approximately 8:30 a.m. to sometime prior to 3:00 p.m., when they arrive back at the adult facility. He disagreed with Ms. Elcock's statement that inmates transported to the juvenile facility only received two hours of instruction each day. Warden Ali explained that the juveniles are awakened at 6:00 a.m. for breakfast and then are ready by approximately 7:30 a.m. for transport to the juvenile facility to participate in the educational program. In response to questioning concerning W.M.'s enrollment in the Sojourn G.E.D. program and his need for approximately six hours of instruction each weekday, Warden Ali stated he would accommodate that need, and would guarantee that W.M. would receive the full six hours of instruction that he was then presently receiving at the juvenile facility.

Warden Ali also stated that juveniles housed at the adult facility are permitted visitors for one hour each day. Contact visits, however, are not permitted; a glass partition separates the inmate from the visitor. Attorney visits are also permitted in the first floor attorney's room.

Dana C. Hobson, Director of the juvenile facility, testified that the authorized capacity of that facility is 242, and that the population of detained juveniles housed there is always either at or above capacity; at the time he testified, the detained juvenile population was 250.

Director Hobson testified that W.M. was in protective custody "due to concern for his safety. His case was highly publicized[,]" and "it was felt that we should take precautions with him at the facility." Director Hobson explained that W.M. is housed in a separate area of the facility with other juveniles in protective custody, but "[h]e doesn't come in contact with the general population on a regular basis."

Director Hobson stated that inmates at the juvenile facility are permitted contact visits with their family members, as well as

attorney visits. On the education issue, Director Hobson testified he and Warden Ali would fully cooperate to ensure that W.M. received the amount of class instruction recommended by his instructors.

W.T., W.M.'s father also testified, stating he felt the best interests and safety of W.M., as well as the continuity of his education, required W.M's continued detention at the juvenile facility. W.T. also noted that his visitation access to W.M. would be more restricted at the adult facility.

W.M.'s extensive prior record of delinquency was also presented to the trial court. On June 4, 2001, W.M. pled guilty to assault and robbery. The disposition imposed was a two-year term of imprisonment at the Jamesburg Training School for Boys, which was suspended; W.M. was placed on probation for a two-year period. On June 18, 2002, W.M. was adjudicated delinquent on a charge of possession of a controlled dangerous substance with the intent to distribute; the disposition imposed was an eighteen-month period of probation. Additionally, W.M. had been charged with two separate violations of the terms of his probation and bench warrants for his arrest were issued; the bench warrants were executed in January 2003, and those matters were still pending at the time of the waiver proceedings. In August 2001, W.M. was charged, in two separate complaints, with receiving stolen property and narcotics offenses; those matters were also still pending.

Subsequent to the detention-placement hearing, counsel submitted written summations. On July 30, 2003, Judge Troiano issued a written decision and entered an order directing the transfer of W.M. from the juvenile facility to the adult facility, effective August 15, 2003. In his decision, the judge stated, in pertinent part:

> The rule and statute clearly provide that the court must determine what is in the best interest of the juvenile considering various factors including age, intelligence, maturity, protection of the public, seriousness of the offense, etc.
>
> The court makes the following findings of fact. The juvenile is presently 17 years of age and has been charged with an aggravated assault against a much

younger child. He has been the product of a dysfunctional family. He has been diagnosed by Dr. Reeves, a psychiatrist, with a conduct disorder. The defense expert diagnosed the juvenile with an adjustment disorder and opines that a blow to the head at an earlier age of 12 had a negative impact on his academic and intellectual abilities. However, he provides no evidence to support this opinion. He also finds the juvenile to be depressed which could be worsened by his transfer to the adult jail. Again, however, he provides no support for this opinion. Depression is a readily treatable condition through medication, which can be monitored whether at the [adult facility] or the [juvenile facility]. This court was not persuaded by the testimony of Dr. Johnson. There does not appear to be any significant physical or medical disability affecting this juvenile.

This juvenile has had a significant prior involvement with the authorities as a result of substantive offenses, violations of probation and bench warrants for failure to appear. Although having a relatively low I.Q., he is clearly able to communicate, understand, function and survive in a home with very little positive adult influence and in a community where he has had to rely on his wits and "street smarts." Although his formal education has been limited, the efforts he has made to acquire his GED have been significant. Eleanor Elcock, who is a Substance Abuse Awareness Coordinator at the [juvenile facility] and who has been directly involved in the establishment of the Sojourn School, has been impressed by the juvenile's efforts and willingness to gain the education that he decided that he wants. Clearly, he has an appropriate level of intelligence and maturity. It appears he is cooperative and most receptive to all instructional activities.

It is clear that juveniles when waived are transferred to an area of the [adult facility] where they are kept sound and sight separated from adult inmates. The maximum number of these detainees is ten. The [adult facility] and the [juvenile facility] recently established a program allowing the transfer on a daily basis from the [adult facility] to the [juvenile facility] of those waived juveniles for purposes of continuing education and recreation. It must be accepted and understood that both the [adult facility] and the [juvenile facility] are custodial settings. The [juvenile facility] has only recently been averaging at or below its maximum capacity of 242. Assaults, harassment and inappropriate behavior are common. The special section of the [adult facility] is specifically separated to assure no contact with the adult population. There is ample time and space allotted for family and attorney [contact]. The maximum number of residents does not exceed ten thus minimizing inappropriate conduct. Although the individual cells are smaller and do not contain desks and visits are no-contact, these factors are not significant enough to persuade the court that the juvenile would suffer by this move.

It is the conclusion of the court that although there are certain inconveniences in being maintained in the separate section of the [adult facility], as a whole the best interests of this juvenile would not be adversely affected by his transfer to the [adult facility].

On appeal, W.M. argues that the evidence does not support the findings of the court, and that the judge misapplied his discretion,

and the law, in ordering that W.M. be transferred from the juvenile facility to the adult facility.

We begin our analysis of the issues advanced on appeal by briefly discussing certain established principles. The scope of appellate review of a trial court's fact-finding function is limited; the factual findings of the trial court are binding on appeal when supported by adequate, substantial, credible evidence. *Cesare v. Cesare*, 154 *N.J.* 394, 411–12, 713 *A.*2d 390, 398–99 (1998); *O'Connor v. O'Connor*, 349 *N.J.Super.* 381, 400–01, 793 *A.*2d 810, 823–24 (App.Div.2002); *State in Interest of J.G.*, 320 *N.J.Super.* 21, 33–34, 726 *A.*2d 948, 954–55 (App.Div.1999). "The aim of appellate review of factual findings is to 'determine whether the findings made could reasonably have been reached on sufficient credible evidence *present in the record.*' " *State in Interest of B.C.L.*, 82 *N.J.* 362, 379, 413 *A.*2d 335, 344 (1980) (quoting *State v. Johnson*, 42 *N.J.* 146, 162, 199 *A.*2d 809, 817 (1964)).

The factual findings and legal conclusions of a trial judge should not be disturbed unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 484, 323 *A.*2d 495, 500 (1974). Moreover, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." *Cesare, supra*, 154 *N.J.* at 413, 713 *A.*2d at 399.

In considering the applicable standard of review to the Family Part's decision on the detention placement of the waived juvenile, we are guided by those standards applied to appellate review of the waiver decision itself. Waiver of a juvenile offender for trial as an adult in the Law Division pursuant to *N.J.S.A.* 2A:4A–26 is highly discretionary and will not be disturbed unless it is shown that the discretion has been misapplied. *See State v. Bessix*, 309 *N.J.Super.* 126, 128–29, 706 *A.*2d 799, 800–01 (App.Div. 1998); *State v. Matarama*, 306 *N.J.Super.* 6, 16–17, 703 *A.*2d 278,

283–84 (App.Div.), *certif. denied,* 153 *N.J.* 50, 707 *A.*2d 154 (1998); *State v. Onque,* 290 *N.J.Super.* 578, 584, 676 *A.*2d 560, 563 (App.Div.), *certif. denied,* 146 *N.J.* 497, 683 *A.*2d 200 (1996). The standard of review applicable to the waiver decision was articulated by the Supreme Court, as follows:

> A word on the subject of appellate review. Here, as in other areas, the criminal justice system reposes this solemn responsibility in the sound discretion of the trial court. In the analogous transfer of jurisdiction to diversionary programs such as pretrial intervention or conditional discharge, the standard of review (with some variations) is whether the correct legal standard has been applied, whether inappropriate factors have been considered, and whether the exercise of discretion constituted a "clear error of judgment" in all of the circumstances. *State v. Humphreys,* 89 *N.J.* 4, 13[, 444 *A.*2d 569, 573] (1982) (citations omitted). The · analysis evokes the three-part test of *State v. Roth,* [95 *N.J.* 334, 363–64, 471 *A.*2d 370, 386–87 (1984)], that 1) findings of fact be grounded in competent, reasonably credible evidence, 2) correct legal principles be applied, and 3) the judicial power to modify a trial court's exercise of discretion will be applied only when there is a clear error of judgment that shocks the judicial conscience. The best measure of a waiver decision will be found in the court's statement of reasons. More is needed than the judge's individual call; specific factors must be delineated on the record. Once the particular standards legally applicable are followed and there is sufficient evidence in the record, the trial court decision should not be subjected to second-guessing in the appellate process.
>
> [*State v. R.G.D.,* 108 *N.J.* 1, 15, 527 *A.*2d 834, 841 (1987).]

■ We discern no reason to apply a different standard to appellate review of the Family Part's determination of the detention placement of the waived juvenile. Accordingly, we must determine whether the findings of fact by the trial judge are supported by substantial, credible evidence contained in the record; whether the judge correctly applied the statutory standards to those factual findings; and whether the exercise of discretion by the judge represented a clear error of judgment that shocks our judicial conscience.

We first examine the statutory criteria. Upon waiver and referral of a matter to the adult court pursuant to *N.J.S.A.* 2A:4A–26, *N.J.S.A.* 2A:4A–36 addresses the issue of detention of juveniles, as follows:

> a. If the court waives jurisdiction over a case and refers that case to the appropriate court and prosecuting authority, there shall be a hearing before the court waiving jurisdiction to decide whether to remand the juvenile to a juvenile or

adult detention facility. The decision shall be based on the best interests of the juvenile and protection of the public, and shall take into account such factors as the juvenile's age and maturity, the nature and circumstances of the offense charged, the juvenile's prior offense history, the programs at each of the detention facilities, and any other relevant factors.

 b. No juvenile who has been waived to an appropriate adult court may be remanded to an adult detention facility prior to the hearing provided for in subsection a.

█ It is evident from the plain language of the statute that, in determining whether the waived, incarcerated juvenile shall be housed in the juvenile or adult facility, the court must make its decision based on the best interests of the juvenile and protection of the public, considering the enumerated statutory factors. We conclude that the test for consideration of evidence in this statutory calculus under the residual, "any other relevant factors" provision, is whether that evidence is relevant to "the best interests of the juvenile" or "protection of the public."

In reviewing the Family Part's decision to remand W.M. to the adult facility, *N.J.S.A.* 2A:4A–36(a) requires consideration of the "nature and circumstances of the offense charged[.]" In addition to the specific alleged facts that form the basis for the subject charge, we interpret that factor to include the "nature" of that charge as it relates to the standards established for waiver in *N.J.S.A.* 2A:4A–26. We reach this conclusion because the extent of the State's burden of proof in a waiver case depends solely upon the "nature" of the charged offense.

The procedure and criteria for waiver of Family Part jurisdiction over incidents that form the basis for a delinquency complaint against a juvenile, and referral of that matter to the Law Division and prosecuting authority for prosecution of the juvenile as an adult are set forth in *N.J.S.A.* 2A:4A–26. Where the juvenile is charged with a so-called "chart 1" offense, as delineated in *N.J.S.A.* 2A:4A–26a(2)(a), the State need not demonstrate "that the nature and circumstances of the charge or the prior record of the juvenile are sufficiently serious that the interests of the public require waiver." *N.J.S.A.* 2A:4A–26a(3). Additionally, when a juvenile is charged with a Chart 1 offense, "[i]n 2000, the Legisla-

ture amended [*N.J.S.A.* 2A:4A–26e] of the Juvenile Code to eliminate the right of a juvenile sixteen years of age or older to defeat a prosecutor's motion to waive a charge of a Chart 1 offense to adult court by showing a probability of rehabilitation before the age of nineteen." *State in Interest of R.C.,* 351 *N.J.Super.* 248, 250, 798 *A.*2d 111, 113 (App.Div.2002).

Here, W.M. was charged with an act of delinquency which, if committed by an adult would constitute second-degree aggravated assault, contrary to *N.J.S.A.* 2C:12–1(b)(1). That charge is among those determined by the Legislature to be more serious, or "Chart 1" offenses, for which the State's burden on a waiver application has been lessened, and the focus of the court's inquiry narrowed. Because W.M. was age sixteen at the time the offense was allegedly committed, the State only bore the burden to establish "probable cause to believe that the juvenile committed [the] delinquent act[.]" *N.J.S.A.* 2A:4A–26a(2)(a).[3] The probability of W.M's rehabilitation prior to age nineteen and whether that probability "substantially outweigh[ed] the reasons for waiver," was irrelevant. *See N.J.S.A.* 2A:4A–26(e). The Legislature has made a conscious decision to treat acts that constitute Chart 1 offenses more seriously. Accordingly, when considering the detention placement of a waived juvenile, the court should consider whether the "nature" of the charge is a Chart 1 offense.

After analyzing the record in the light of the oral and written arguments advanced by the parties, we conclude that the factual findings of the trial judge are supported by substantial, credible evidence contained in the record, and could reasonably have been reached based on that evidence. W.M.'s contentions to the contrary are without merit.

---

[3] Although not relevant to the issues on appeal, we note "that a prosecutor's motion for waiver to adult court of a juvenile complaint that falls within the Attorney General's Guidelines must be accompanied by a copy of the prosecutor's statement of reasons and that a prosecutor's waiver decision is subject to judicial review." *R.C., supra,* 351 *N.J.Super.* at 250–51, 798 *A.*2d at 113.

Specifically, W.M. argues the State submitted no expert testimony and that the record does not support the trial court's rejection of the testimony of Dr. Johnson. We disagree. It is well established that the trier of fact is not bound to accept expert opinion, *State v. Berry*, 140 *N.J.* 280, 301, 658 *A.*2d 702, 713 (1995), "even if it is unrebutted by any other evidence." *Torres v. Schripps, Inc.*, 342 *N.J.Super.* 419, 431, 776 *A.*2d 915, 921 (App. Div.2001). Moreover, expert opinion "need not be given greater weight than other evidence nor more weight than it would otherwise deserve in light of common sense and experience." *Id.* at 430, 776 *A.*2d at 921.

Here, Judge Troiano found unpersuasive Dr. Johnson's ultimate conclusion that the transfer of W.M. to the adult facility would not be in the juvenile's best interests, and said why. There was sufficient, credible evidence in the record from which the judge could reasonably have reached that conclusion. Dr. Johnson painted the picture of a juvenile with serious intellectual and social deficiencies who would be endangered in the adult facility. However, Ms. Elcock described W.M. as progressing well in the educational program offered at the juvenile facility, and stated he was capable of earning a G.E.D. and a good candidate for enrolling in the college courses in the "Distant Learning [program] through Burlington County College." Director Hobson testified that W.M. was enrolled in "Math, English, earth science, U.S. history, art, career exploration, exploration of computers and reading, physical education[ ]" courses and he had attained grades of "B" in five courses and "A" in two courses. Accordingly, there was sufficient, credible evidence in the record to support the court's rejection of Dr. Johnson's testimony.

Additionally, the judge rejected Dr. Johnson's suggestion that a possible prior concussion suffered by W.M. in 1998 impaired W.M.'s cognitive and intellectual abilities and, thus, was relevant on the issue of his detention placement. The court found that opinion inconsistent with the testimony of Ms. Elcock concerning W.M.'s progress in the educational program. Accordingly, the

rejection of Dr. Johnson's opinion and the judge's conclusion that "[t]here does not appear to be any significant physical or medical disability affecting" W.M. could reasonably have been reached based upon sufficient, credible evidence contained in the record.

W.M. also contends that in concluding "the best interests of this juvenile would not be adversely affected by his transfer to the [adult facility,]" the trial court applied an incorrect standard. W.M. argues that the statutory standard requires a placement that serves the "best interests" of the juvenile, not a finding as to whether placement in the adult facility would adversely affect those best interests. Although W.M. correctly recites the "best interests" portion of the statutory standard, we do not agree that the trial court applied the wrong standard.

The referenced wording in the judge's written decision must be read in conjunction with the totality of the decision, and in the context of it addressing Dr. Johnson's testimony that W.M.'s best interests would be adversely affected if he were to be transferred to the adult facility. A fair reading of Judge Troiano's written decision reflects application of the "best interests" standard in conjunction with the relevant statutory factors.

W.M. was charged with committing a Chart 1 offense at age sixteen; his prior offense history was significant and indicative of a lack of control; the programs at each of the detention facilities were comparable, including continuance of his educational program at the adult facility at the same level of participation while he was housed at the juvenile facility; and the safety concerns were unfounded in light of the uncontroverted evidence that juveniles housed in the adult facility are sight-and-sound segregated from the adult population into a small control group of ten or less inmates. We can find no misapplication of discretion by the trial court in entering the July 30, 2003 order directing that W.M. be transferred to the adult facility for detention pending resolution of the charges filed against him. Moreover, under the

circumstances disclosed by the record on appeal, that decision does not shock our judicial conscience.

Affirmed.