# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4099-16T4

STATE OF NEW JERSEY
IN THE INTEREST OF T.P.,
a Juvenile.

_____

Submitted December 20, 2018 – Decided February 6, 2019

Before Judges Simonelli and Whipple.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket Nos. FJ-20-0941-16, FJ-20-1040-16, FJ-20-1107-16, FJ-20-0037-17 and FJ-20-0164-17.

Joseph E. Krakora, Public Defender, attorney for appellant T.P. (Janet A. Allegro, Designated Counsel, on the briefs).

Michael A. Monahan, Acting Union County Prosecutor, attorney for respondent State of New Jersey (Michele C. Buckley, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following a trial, appellant T.P., a juvenile, was adjudicated delinquent for an act which, if committed by an adult, would constitute the crimes of receiving third-degree stolen property, N.J.S.A. 2C:20-7, and first-degree carjacking, N.J.S.A. 2C:13-2(a)(1)/(2). Prior to sentencing, T.P. pled guilty under separate complaints to criminal mischief, a disorderly persons offense, N.J.S.A. 2C:17-3.1; mutual fighting, a petty disorderly offense, N.J.S.A. 2C:12-1; two counts of third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(5)(d) and N.J.S.A. 2C:12-1(b)(7); and violation of probation, N.J.S.A. 2C:45-3. The trial judge sentenced T.P. to an aggregate four-year term with the Juvenile Justice Commission and remanded him to the Youth Detention Center.

On appeal, T.P. raises the following contentions:

POINT I: THE COURT'S FINDINGS OF DELINQUENCY MUST BE REVERSED AS THE STATE IMPROPERLY CROSS-EXAMINED THE DEFENSE ALIBI WITNESSES THEREBY DENYING THE JUVENILE HIS RIGHT TO A FAIR TRIAL. (Raised below in part).

POINT II: THE COURT FAILED TO APPLY THE LEGAL STANDARDS REGARDING ALIBI WITNESSES. (Raised below in part).

POINT III: THE COURT'S FINDING OF DELINQUENCY WAS NOT SUPPORTED BY SUFFICIENT

2

CREDIBLE EVIDENCE IN THE RECORD AND MUST BE REVERSED. (Raised below).

POINT IV: THE SENTENCE IMPOSED BY THE COURT WAS EXCESSIVE. (Raised below).

We reject these contentions and affirm.

I.

At approximately midnight on June 12, 2016, B.M. parked his car, gathered his belongings and, as he exited the car, someone, later identified as T.P., grabbed him from behind in a bear hug and pushed him against the car. B.M. turned around after T.P. released him and saw T.P. and another individual standing approximately two feet away within reaching distance. There were streetlights bright enough for B.M. to see their faces and that they were African-American males between sixteen and eighteen years old with short hair. B.M. believed they might have a gun. T.P. and his accomplice went through B.M.'s pockets and took his cellphone, ATM card, driver's license, and car keys. T.P. threatened B.M. not to call the police and warned if he did so, they would return and shoot him, as they knew who he was and where he lived, having stolen his driver's license. T.P. then took B.M.'s car without B.M.'s permission, and drove away, with his accomplice in the passenger seat. The encounter lasted approximately five minutes.

A-4099-16T4

At approximately 8:00 a.m. on June 13, 2016, B.M. called the Elizabeth Police Department (EPD) and reported the carjacking. B.M. then went to police headquarters and gave a statement and description of the two perpetrators. B.M. said the individual who grabbed him wore a tank top, the other individual wore a T-shirt, and he would be able to identify both of them if he saw them. B.M said the two perpetrators did not have facial hair and he did not see any tattoos.

At approximately 12:00 p.m. on June 13, 2016, Detective Robert Schafranek from the EPD was on patrol in a marked patrol car when he saw a car traveling at a high rate of speed in the area of a school where children were present. Schafranek noticed the car had black plastic covering on the rear windshield held on by white tape. He was unable to stop the car at that time.

Approximately three hours later, Schafranek again saw the car and decided to run a random license plate check. Schafranek called for backup after the check revealed the car had been carjacked. Other officers arrived at the scene and arrested the female driver and a male passenger, T.P. The officers found B.M.'s ATM card, driver's license and car keys inside the car. B.M.'s cellphone was never recovered. T.P. was charged with third-degree receiving stolen property. His mother, S.P., and stepfather, J.F., learned of his arrest later that day.

A-4099-16T4

B.M. returned to police headquarters on June 16, 2016, and participated in a videotaped photo array administered by Detective Alexander Negrin.[1] Negrin had no knowledge of the case, did not participate in its investigation, and had not previously met B.M. Further, B.M. was not told the police had recovered his car or that T.P. was found inside the car.

The photo array booklet contained six photos. B.M looked at the photos, immediately selected the photo of T.P, and identified T.P. as the person who was wearing the tank top and who had grabbed him and took his car. B.M. was a "[h]undred-percent confident" in his identification of T.P. Negrin noted on the photo identification form that B.M. said he was "a hundred-percent sure" of his identification of T.P. At trial, B.M. identified T.P. in court as the person who grabbed him, took his car, and threatened him, and identified the photo of T.P. he had selected at the photo array.

The matter was initially scheduled for a trial on October 17 and 18, 2016 but was adjourned to November 2 and 3, 2016, because the defense stated its intent to assert an alibi defense. A notice of alibi was not filed until two days

---

[1] The videotape was played to the trial judge and placed into evidence. It has not been supplied on appeal.

A-4099-16T4

later, on October 19, 2016. The State's investigators thereafter met with T.P.'s alibi witness, his stepfather, J.F., but the specific date has not been provided.

At trial, J.F. testified that on June 10, 2016, S.P. filed a missing person's report after T.P. ran away, which T.P. did often. J.F. next saw T.P. on June 11, 2016, and T.P. was "in and out" of the house. J.F. again saw T.P. at home at 7:30 that night and T.P. slept there. T.P. was home when J.F. left the morning of June 11, 2016.

J.F. testified he next saw T.P. at home at approximately 9:30 p.m. on June 12, 2016. At approximately 11:30 p.m., J.F. let T.P. use his cellphone to talk to a girl. T.P. talked to the girl for approximately thirty minutes in J.F.'s presence, and remained in J.F.'s presence until approximately 1:00 a.m. on June 13, 2016. Notably, T.P. never produced J.F.'s cellphone records or provided the identity of the girl he allegedly called to corroborate J.F.'s testimony.

J.F. testified he woke T.P. up at 6:00 a.m. on June 13, 2016, and took T.P. and J.F.'s other children to J.F.'s mother's house. Later that evening, S.P. told J.F. that T.P. had been arrested for receiving stolen property. At a court hearing approximately two weeks later, S.P. learned that T.P. was also charged with carjacking and advised J.F., who was not present in court.

A-4099-16T4

J.F. testified he attended a court hearing two weeks later and claimed he told T.P.'s then-attorney from the Office of the Public Defender (OPD) that it was impossible T.P. committed the crime because T.P. was home with him at the time of the carjacking. J.F. also claimed that no one from the OPD met with him about T.P.'s alibi.

On cross-examination, the State established that J.F. and T.P. had a close father-son relationship and J.F. wanted to protect T.P. In addition, J.F. admitted he attended five court hearings, never contacted the OPD about T.P.'s alibi, and never asked the OPD to send someone to speak with him about the alibi. J.F. also admitted he never contacted the EPD about T.P.'s alibi.

J.F. further admitted that S.P. previously reported T.P. missing approximately twenty times; T.P. was missing for three days before S.P. reported him missing on June 10, 2016; and neither he nor S.P. called the EPD on June 11 or 12, 2016, to inform them that T.P. was no longer missing. On re-direct examination, J.F. testified he did not call the EPD because T.P. was on probation and violated probation by breaking curfew, and he felt badly and did not want to see T.P. go to jail.

T.P.'s thirteen-year-old sister, T.F., also testified as an alibi witness. Contrary to J.F.'s testimony, T.F. testified that she learned T.P. had been charged

with carjacking two days after T.P.'s arrest. She also testified she was watching television with S.P. at approximately 8:30 p.m. on June 12, 2016, and then went upstairs to her bedroom. T.P. came home at approximately 9:30 p.m.; she saw him at approximately 11:30 p.m. when he went upstairs to his bedroom; and she saw him in his bedroom watching television at approximately 1:30 a.m. on June 13, 2016, when she went to sleep. Between 6:15 a.m. and 6:30 a.m., J.F. took her, T.P. and another sibling to their grandmother's home.

T.F. had given a handwritten written statement to the OPD in July 2016, which contradicted her direct testimony. In addition, she had testified that she learned of the carjacking charge two or three days after T.P.'s arrest, where her mother and father were not informed of new charge until two weeks later.

S.P. also testified as an alibi witness; however, she did not provide an alibi. She testified that T.P. came home between 8:30 p.m. and 9:30 p.m. on June 12, 2016, and she went to bed at approximately 10:30 p.m. and did not see him until approximately 6:40 next morning. Thus, she could provide no testimony regarding T.P.'s whereabouts at the time of the carjacking.

In an oral opinion at the conclusion of the trial, the trial judge found B.M. extremely credible and his identification of T.P. unassailable. The judge did not give great weight to T.F.'s testimony. As for J.F., the judge noted he had a close

8

relationship with T.P. and questioned why he did not follow up with providing an alibi defense or submit evidence corroborating his testimony about T.P. using his cellphone. Thereafter, the judge found the elements of carjacking and receiving stolen property and found T.P. delinquent.

## II.

On appeal, T.P. contends the State improperly cross-examined J.F. about his delay in disclosing the alibi to authorities, and the judge failed to address the legal standard regarding the cross-examination of an alibi witnesses. Because T.P. raises these arguments for the first time on appeal, we apply the plain error of review.[2] "We may reverse on the basis of unchallenged error only if the error was 'clearly capable of producing an unjust result.'" State v. Ross, 229 N.J. 389, 407 (2017) (quoting R. 2:10-2). We discern no error, let alone plain error, here.

"[A]n alibi witness, like any other witness, may be cross-examined with a view to demonstrating the improbability or even fabrication of his testimony." State v. Silva, 131 N.J. 438, 445 (1992) (quoting State v. Bryant, A.2d 451, 466 (Conn.1987)). The scope of the cross-examination rests in the discretion of the

---

[2] Although T.P. indicates in his merits brief that these issues were partially raised below, a review of the record indicates otherwise.

trial court and will not be disturbed absent a finding of prejudicial error. Id. at 449.

The cross-examination of an alibi witness as to the witness's delay in coming forward is, in essence, a challenge to the witness's credibility on the ground that the prior silence, i.e. failure to disclose the alibi to the authorities, is sufficiently inconsistent with the subsequent alibi testimony as to permit an inference of recent fabrication. Id. at 444-48. The question is whether the alibi witness's "silence may reasonably be viewed as inconsistent with [the witness's] testimony." Id. at 447 (alteration in original) (quoting State v. Marshall, 260 N.J. Super. 591, 598 (App. Div. 1992)).

"[T]he failure of a witness to offer [alibi] information when it would have been natural to do so might well cast doubt on the veracity of the witness' trial testimony. A witness's silence in such circumstances is akin to a witness's 'prior inconsistent statement,' and therefore, has probative value." Id. at 446 (quoting Commonwealth v. Brown, 416 N.E. 2d 818, 224 (Mass. App. Ct. 1981)). A parent-child alibi, like the purported alibi here, is the prototypical situation where it would be "natural" for an alibi witness to immediately come forward. Ibid.

A-4099-16T4

Nevertheless, while "the rules of evidence allow cross-examination on the prior inconsistency," "a proper foundation must be laid." Id. at 447-48. A proper foundation is laid by asking whether "the witness was aware of the nature of the charges pending against the defendant, had reason to know he had exculpatory information, had a reasonable motive to act to exonerate the defendant, [and] was familiar with the means to make the information available to law enforcement authorities[.] " Ibid. (quoting State v. Silva, 252 N.J. Super. 622, 629 (App. Div. 1991)).

"During routine cross-examination, a proper foundation will exist or not depending on the circumstances of each case and the alibi witness's answers to the questions. Defense counsel can object to any question or argument that fails to follow from that foundation." Id. at 449. The scope of cross-examination rests in the discretion of the trial court and will not be disturbed absent a finding of prejudicial error. Ibid.

All of the foundational requirements in Silva were satisfied here. J.F. was aware of the carjacking charge two weeks after the incident and knew he had exculpatory information. J.F. had a close familial relationship and bond with T.P. and a reasonable motive to exonerate him. J.F. was also familiar with the means to make the alibi information available to law enforcement authorities,

11

but never contacted the EPD and did not notify the State until the day of trial on October 17, 2016, four months after he learned of the carjacking charge.

T.P.'s sub-arguments are without merit. For example, T.P. argues that the State did not highlight the submission of the notice of alibi on October 19, 2016, two weeks prior to the trial, or explicitly restrict its questions to the period prior to the notice. As an initial matter, this argument is tenuous at best, given the fact that trial was initially scheduled for October 17 and 18, 2016, T.P. did not identify the alibi witness until the initial trial date, necessitating an adjournment to allow the State to investigate this new disclosure, and only thereafter was the notice of alibi submitted. Furthermore, the State explicitly acknowledged in its cross-examination that J.F. had been interviewed by the prosecutor's investigators, and in no way attempted to mislead the judge as to the fact that J.F. came forward with the alibi prior to the start of the trial on November 2, 2016.

T.P. also argues that it was "unfair" to question J.F. about his failure to inform law enforcement or the State of the alibi because J.F. had informed defense counsel, it would have been futile to go to the EPD after charges were laid, and J.F. later cooperated with the prosecutor's investigators. These arguments bear no relation to the limitations on cross-examination imposed by

Silva, and were, at best, lines of questioning that could have been fully pursued to rehabilitate J.F. on re-direct examination. As noted in Silva, in the absence of objection (or perhaps failure to rehabilitate J.F.), there is no appealable error cognizable on direct appeal. 131 N.J. at 449.

We are satisfied the State's cross-examination of J.F was proper. Further, the judge, as fact finder, was permitted to evaluate J.F.'s testimony and make credibility findings. The record amply supports the judge's finding that J.F. was not a credible alibi witness and his decision is entitled to deference. State v. K.W., 214 N.J. 499, 507 (2013).

### III.

T.P. contends that the judge's finding of delinquency was not supported by sufficient credible evidence in the record. This contention lacks merit.

"The scope of appellate review of a trial court's fact-finding function is limited; the factual findings of the trial court are binding on appeal when supported by adequate, substantial, credible evidence." State ex rel. W.M., 364 N.J. Super. 155, 165 (App. Div. 2003). "The aim of appellate review of factual findings is to 'determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record.'" Ibid. (quoting State in Interest of B.C.L., 82 N.J. 362, 379 (1980)). "The factual findings and

13

legal conclusions of a trial judge should not be disturbed unless 'they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Ibid. (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)).

We give great deference to the trial judge's factual findings and will not "engage in an independent assessment of the evidence as if [we] were the court of first instance." State v. Locurto, 157 N.J. 463, 471 (1999). We also give deference to the trial judge's credibility determinations. Id. at 474. However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

T.P.'s challenge to the judge's findings focuses on two areas: (1) the only evidence for T.P. being the carjacker, rather than merely a passenger in the stolen vehicle, was the victim's allegedly problematic identification; and (2) the judge's assessment of J.F.'s and T.F.'s credibility.

T.P. is correct that when the police discovered him in B.M.'s car fifteen hours after the carjacking none of B.M.'s personal items were recovered directly on his person. B.M.'s ATM card was located on the driver's side driver's side, B.M's driver's license was located in the driver's side door panel, and B.M.'s car

14

keys were in the ignition. Nevertheless, the judge reasonably relied on B.M.'s recollection of the incident and his photo identification of T.P. as the carjacker in reaching his finding of delinquency. B.M. was firm and consistent in his recollection of the incident and of T.P. being the individual who grabbed and threatened him and stole his car. B.M demonstrated that certainty at the time of the photo identification and at trial.

T.P. takes issue with B.M's inability to recall whether he had a tattoo on his forearm or a mustache at the time of the carjacking; however, these deficiencies had a simple explanation. As the prosecutor explained in summation, T.P. has dark skin, the tattoo is in a dark shade of ink, and it is located on the underside of T.P.'s forearm. It would thus be difficult to identify in the best of circumstances.

B.M.'s inability to recall whether T.P. had facial hair is similarly explained, given T.P.'s dark skin and dark mustache, which B.M. could not even at trial, and which was apparently difficult for the judge and prosecutor to see as well. In addition, T.P. never established he had facial hair on the night of the carjacking. Overall, B.M.'s description of T.P. and identification of T.P. as the carjacker comports with the B.M's testimony that he "got a good look [but] just wasn't paying attention to details," and was reasonably credited by the judge.

15

T.P. also generally questions the photo identification, where the judge did not hold a Henderson[3] hearing. However, T.P. failed to demonstrate any "evidence of suggestiveness that could lead to a mistaken identification," much less proof of "a very substantial likelihood of irreparable misidentification," the defendant's "ultimate burden." See Henderson, 208 N.J. at 288-289. The photo array was conducted "blind," in that the conducting officer was not involved in or knowledgeable of the investigation or arrest of T.P.; B.M. was not told that his car had been recovered or that T.P. was found inside the car; and B.M. was one-hundred percent certain in his identification of T.P. That the photo array was presented to B.M. three days after the carjacking is of no moment and is not evidence of suggestiveness or proof of a substantial likelihood of misidentification. The judge thus properly concluded the identification was not tainted and justifiably relied on it. As T.P. failed to substantiate any of the factors under the Henderson analysis he was not entitled to a hearing.

Furthermore, the judge properly discredited J.F.'s alibi testimony. J.F. testified that during the crucial block of time when the carjacking occurred, T.P. borrowed his cellphone and was talking to a girl, yet T.P. and J.F. did not provide J.F.'s cellphone records or the girl's identity. The evidence adduced at trial

---

[3] State v. Henderson, 208 N.J. 208 (2011).

amply supported the judge's determination that J.F. was not a credible alibi witness.

Similarly, the trial judge did not afford the alibi testimony of T.F., great weight. Her testimony on direct and cross-examination revealed many inconsistencies. For example, she claimed that she learned of the carjacking charge two or three days after T.P.'s arrest, whereas family was not informed of the new charge until T.P.'s court appearance two weeks later. T.F.'s testimony also contradicted her handwritten statement to investigators, and she generally gave the judge "the impression that she knew basically what was told to her. She was very -- not clear as to the incident." We are satisfied that the record amply supports the judge's factual findings and credibility determination are supported by sufficient, credible evidence and should not be disturbed.

IV.

T.P. challenges his sentence in Point IV, arguing the judge failed to consider certain mitigating factors. We disagree.

New Jersey law prescribes a "system for 'structured discretion' in sentencing." State v. Bieniek, 200 N.J. 601, 607 (2010) (quoting State v. Roth, 95 N.J. 334, 345 (1984)). Appellate review of a juvenile disposition is guided by well-established sentencing standards. We examine whether the trial judge

followed lawful sentencing guidelines and determine whether the sentence imposed could have been reasonably reached based upon the evidence presented. Roth, 95 N.J. at 365-66, 471. We are "bound to affirm a sentence, even if [we] would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. O'Donnell, 117 N.J. 210, 215 (1989).

Under the Juvenile Code, the judge, in considering whether a custodial disposition is appropriate, must weigh the aggravating and mitigating factors set forth in N.J.S.A. 2A:4A-44(a). The judge must then place on the record the factual basis supporting the findings of the particular factors affecting the sentence, as well as the reasons for the disposition chosen, whether custodial or non-custodial. See N.J.S.A. 2A:4A-44(d)(1); R. 5:24-3.

T.P. does not challenge the judge's findings of aggravating factor (c), "[t]he character and attitude of the juvenile indicate that the juvenile is likely to commit another delinquent or criminal act;" aggravating factor (d) "[t]he juvenile's prior record and the seriousness of any acts for which the juvenile has been adjudicated delinquent;" aggravating factor (g), "[t]he need for deterring the juvenile and others from violating the law;" aggravating factor (j), "[t]he

impact of the offence on the victim or victims;" aggravating factor (k), "[t]he impact of the offense on the community;" and aggravating factor (l), "[t]he threat to the safety of the public or any individual posed by the child."   N.J.S.A. 2A:4A-44(a)(1)(c), (d), (g), (j), (k) and (l).   The record amply supports these aggravating factors.

The judge found mitigating factor (e), "[t]here were substantial grounds tending to excuse or justify the juvenile's conduct, though failing to establish a defense[,]" N.J.S.A. 2A:4A-44(a)(2)(e), based on T.P.'s bi-polar disorder.   The judge also found mitigating factor (g), "[t]he juvenile has compensated or will compensate the victim for the damage or injury that the victim has sustained, or will participate in a program of community service[,]" N.J.S.A. 2A:4A-44(a)(2)(g), on the basis that T.P. "will compensate as a result of being incarcerated."

T.P. argues the judge should have found mitigating factor (c), "[t]he juvenile did not contemplate that the juvenile's conduct would cause or threaten serious harm[,]" N.J.S.A. 2A:4A-44(a)(2)(c).   However, T.P.'s threat that he would shoot B.M. if he contacted the police, and the judge's finding that there was no question those words were said to B.M., preclude finding this mitigating factor.

A-4099-16T4

T.P. argues the judge should have found mitigating factor (i), "[t]he juvenile's conduct was the result of circumstances unlikely to recur[,]" N.J.S.A. 2A:4A-44(a)(2)(i), and mitigating factor (j), "[t]he character and attitude of the juvenile indicate that the juvenile is unlikely to commit another delinquent or criminal act[,] N.J.S.A. 2A:4A-44(a)(2)(j). However, the judge's findings of aggravating factors (c) and (d), as well as T.P.'s lengthy prior record, which includes violent assaults and robbery, preclude finding these mitigating factors. Further, T.P.'s commission of the carjacking was part of a serious pattern of delinquent behavior, and he presented no evidence it was the product of circumstances unlikely to reoccur or that he is unlikely to commit another delinquent or criminal act.

Lastly, T.P. argues the judge should have found mitigating factor (k), "[t]he juvenile is particularly likely to respond affirmatively to noncustodial treatment[,]" N.J.S.A. 2A:4A-44(a)(2)(k). However, the record confirms that T.P. failed to comply with past noncustodial treatment, including the failure to report to probation and the commission of other offenses while on probation. In addition, even while in detention, T.P. committed various offenses, including assault. T.P. has therefore demonstrated sufficient noncompliance with past treatment to preclude a finding of mitigating factor (k).

20                                                                          A-4099-16T4

Given the gravity and circumstances of the carjacking, the numerous charges to which T.P. pled guilty, and T.P.'s past conduct and history, the sentence was based upon substantial, competent credible evidence in the record, fell well within the boundaries of the judge's sentencing discretion, and will not be disturbed.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4099-16T4